CHEESEBROUGH AND OTHERS *against* MILLARD AND
OTHERS.

MILLARD AND OTHERS *against* CHEESEBROUGH AND
OTHERS.

If a creditor has a *lien* on two different parcels of land, and another creditor has a subsequent *lien* on one only of the two parcels, and the prior creditor elects to take his whole demand out of the parcel of land on which the subsequent creditor has his *lien,* the latter is entitled either to have the prior creditor thrown upon the other fund, or to have the prior *lien* assigned to him, for his benefit.

So, if a bond creditor exacts the whole of his demand from one of the sureties, that surety is entitled to be *substituted* in his place, and to a cession of his rights and securities, as if he were a purchaser, either against the principal debtor or his co-sureties :

And if the prior creditor has put it out of his power to make the cession, *it seems,* that he will be excluded from so much of his demand as the *surety,* or subsequent creditor, might have obtained, if the cession could have been made :

But if the prior creditor, who has disabled himself from making the assignment, has acted with good faith, and without knowledge of the rights of the other creditor, he is not to be injured by his inability to make the cession ; the doctrine of *substitution* being founded on mere equity and benevolence.

Where a bond, payable in *two* instalments, was secured by a mortgage on a *mill,* &c., and the debtor, afterwards, gave a second mortgage on six other lots of land, specifically, to secure the payment of the first instalment, but without reference to the first mortgage ; and all the parties, afterwards, by an arrangement between them, declared the second instalment paid, and cancelled the first mortgage, leaving the second mortgage to remain as security for the first instalment ; and at a sale of the six lots, under a subsequent judgment, which was a *lien* on the equity of redemption, in these lots only, A. purchased *two* lots, and B. *four* lots, knowing, at the time, the situation of the mortgage ; and B. afterwards purchased the second mortgage, and filed a bill to foreclose : it was held that A. was bound to *contribute* towards the satisfaction of the principal and interest due on the first instalment, according to the actual relative value of the lots, and not according to the prices for which they were sold at the sheriff's sale.

THE following are the material facts on which the controversy between the parties in the above causes arose, and

1815.

CHEESE-
BROUG H.
v.
MILLARD.

will be sufficient to explain the grounds on which the decision of the court turned, without a minute detail of the voluminous pleadings and proofs.

On the 22d of *December*, 1803, *Thomas Smith*, of *Milton*, county of *Saratoga*, executed a bond to *Ambrose Millard*, (defendant,) and *Benajah Millard*, for the payment of 3,500 dollars, in two instalments, with interest; and to secure the payments, he, at the same time, executed a mortgage on certain mill-property, in *Ballston*. Afterwards, on the 17th of *March*, 1804, *Smith*, as collateral security for the payment of the *first* instalment, and the interest on the bond, executed a second mortgage, on six lots of land in the village of *Waterford*, and about which the present controversy arose. The second mortgage recited the bond, and that the mortgage was given for securing the payment of the first instalment, and interest, but made no mention whatever of the first mortgage. By the endorsements on the bonds and mortgages, it appeared, that on the 8th of *June*, 1808, *Samuel Bacon*, and on the 26th of *October*, 1808, *Benjamin Marvin*, also became interested in the bond and securities; and by some arrangements of the parties, *Marvin* was, at that time, considered as the owner of the first mortgage, and *Ambrose Millard*, one of the mortgagees in the first mortgage, as owner of the second mortgage. Afterwards, on the 12th of *January*, 1809, by agreement between all the parties concerned in the two mortgages, *Smith* was credited on his bond with the payment of the *second* instalment, and *Marvin* discharged the *first* mortgage; and the first instalment which was declared to be unpaid, was left to rest for its security on the second mortgage. The chief object of this arrangement appeared to have been to accommodate third persons, *Miller* and *Tayler*, who were interested in the mill-property. Before this arrangement, however, was made, *John Van Schaick* and *Myndert Van Schaick*, jun., (defendants in the first suit,) had, on the 13th of *June*, 1808, obtained a judgment in the supreme court against *Smith*, the mortgagor, which bound his equity of re-

demption in the second mortgage; his interest in the lands covered by the first mortgage having been passed away by him.

An execution was issued on the judgment of *J.* and *M. Van Schaick,* and the lots included in the second mortgage were sold by the sheriff, in *January,* 1810; and, at the sheriff's sale, the plaintiffs in the first suit became the purchasers of *two* of the lots, with full knowledge, at the time, of the existence of the second mortgage, and of the discharge of the first mortgage; the other *four* lots were purchased by *J.* and *M. Van Schaick,* the plaintiffs in the execution.

Afterwards, on the 7th of *December,* 1810, *John D. P. Douw,* (defendant also in the first suit,) as trustee of the joint interest of himself and *J.* and *M. Van Schaick,* took from *Ambrose Millard* an assignment of the bond and second mortgage, in order to be protected against it; and proceeded to foreclose the mortgage by advertising the sale of the mortgaged premises at auction, under a power of sale contained in the mortgage. The plaintiffs in the first suit, who were the purchasers of two of the lots, then offered *Douw* and *Van Schaick* to contribute to the discharge of the second mortgage, according to the relative value of those lots, estimated by the sheriff's sale, but this offer was refused.

The plaintiffs in the first suit, as purchasers of the two lots, then filed their bill the 19th of *July,* 1811, to be discharged from the second mortgage altogether, on the ground of *fraud,* &c., or to be relieved, on contributing rateably to the payment of the moneys secured by the mortgage; and also, for an injunction against the proceedings of *Douw* under the mortgage.

The plaintiffs in the second suit filed their bill the 23d of *November,* 1811, to compel the plaintiffs in the first suit to redeem the mortgage by contributing according to the actual relative value of the lots, or that the equity of redemption as to those two lots be foreclosed.

1815.

CHEESE-
BROUGH
v.
MILLARD.

*Woodworth*, for the plaintiffs, in the first, and for the defendants in the second, cause.

*Henry*, contra.

THE CHANCELLOR. The controversy resolves itself into these two questions:

1st. Whether *Cheesebrough and others* are bound to contribute towards the payment of the mortgage?

2dly. If they are, then what is to be the rule of contribution?

1. The weight of testimony is decisive in proof of the agreement and understanding of all the parties to the bond and mortgages, that the payment of the 1,902 dollars and 78 cents, for which the receipt was given by *Bacon*, and the certificate of discharge by *Marvin*, was to be applied to the discharge of the second, and not of the first, instalment. This appears from the depositions of *Bacon*, *Cook*, and *G. Van Schoonhoven*, and from the certificate itself. I see no room to doubt of the intention of the parties, or of the validity of the arrangement. It was one which they were competent to make, and it was evidently made in good faith, and for their mutual convenience, without any intention injurious to others. The first mortgage was, therefore, absolutely discharged, and the second mortgage remained binding as a security for the first instalment; and it cannot now be questioned, or denied, to be a subsisting encumbrance, unless the purchaser, under the judgment, can show some equitable right arising out of the circumstances of the case, to be protected from its operation.

I admit, as a principle of equity, that if a creditor has a lien on two different parcels of land, and another creditor has a lien of a younger date on one of those parcels only, and the prior creditor elects to take his whole demand out of the land on which the junior creditor has a lien, the latter will be entitled, either to have the prior creditor thrown

upon the other fund, or to have the prior lien assigned to
him, and to receive all the aid it can afford him. This is a
rule founded in natural justice, and I believe it is recognised
in every cultivated system of jurisprudence. In the *Eng-*
*lish* law, it is an ordinary case, that if a party has two funds,
he shall not, by his election, disappoint another who has one
fund only, but the latter shall stand in the place of the
former, or compel the former to resort to that fund which
can be affected by him only, (*Sagitary* v. *Hyde*, 1 *Vern.*
455. *Mills* v. *Eden*, 10 *Mod.* 488. *Attorney General* v.
*Tyndall, Amb.* 614. *Aldrich* v. *Cooper*, 8 *Ves.* 388.
391—5. *Trimmer* v. *Bayne*, 9 *Ves.* 209.) The party
liable to be affected by this election, is usually protected
by means of *substitution*. Thus, for instance, if the cre-
ditor to a bond exacts his whole demand of one of the sure-
ties, that surety is entitled to be substituted in his place,
and to a cession of his rights and securities as if he was a pur-
chaser, either against the principal debtor or the co-sureties.
This doctrine of substitution, which is familiar to the civil
law, (*Dig.* 46. 1. 17. and 36. *Voet*, h. t. s. 27, 29. 30.,)
and the law of those countries in which that system essen-
tially prevails, (*Pothier's Traite des Oblig.* n. 275. 280.
427. 519, 520. 522. *Kaims' Equity*, vol. 1. 122. 124.
*Hub. Prælec. Inst.* lib. 3. tit. 21. n. 8.,) is equally well
known in the *English* chancery. In the case, *ex parte*
*Crisp*, (1 *Atk.* 133.,) Lord *Hardwicke* said, that where the
surety paid off a debt, he was entitled to have, from the
creditor, an assignment of the security, to enable him to ob-
tain satisfaction for what he had paid beyond his proportion;
and in *Morgan* v. *Seymour*, (1 *Ch. Rep.* 64.,) the court
decreed that the creditor should assign over his bond to the
two sureties, to enable them to help themselves against the
principal debtor. To apply, then, the general principle to
the present case, if the first mortgage had not been dis-
charged, and the mortgagee had chosen to enforce the pay-
ment of the whole first instalment, from the lands covered

1815.

CHEESE-
BROUGH
v.
MILLARD.

by the second mortgage, to the loss, perhaps, of the lien of the judgment creditor by the consumption of the subject, that creditor, and, probably, the purchaser under the judgment, would have been entitled, either to have turned him from the path he had taken, or to the aid of the first mortgage, to recover a proportional indemnity from the other lands covered by that mortgage. But, in this case, the first mortgage is cancelled, and no such recourse can be had; and the question which arises is, whether the second mortgage can, in such case, be enforced? It appears from some of the authorities to which I have referred, to be well settled, that if the creditor has put it out of his power to make the assignment, he is, in many cases, to be precluded from so much of his demand as the surety, or younger creditor, might have procured, if the cession could have been made. *Repellitur exceptione cedendarum actionum.* And if the judgment creditor, in this case, had given notice to the owner of the first mortgage, before the arrangement and discharge took place, of the equity which he claimed and expected, I might, probably, have been inclined to have stayed, to a certain extent, the operation of the second mortgage. But there is no evidence, or even ground for presumption, that either *Marvin* or *Millard*, the owners of the mortgages, knew of the existence of the judgment when the arrangement was made and carried into effect. They were not bound to search for the judgment, and the record was no constructive notice to them; and as this rule of substitution rests on the basis of mere equity and benevolence, the creditor who has thus disabled himself from making it, is not to be injured thereby, provided he acted without knowledge of the other's rights, and with good faith and just intention, which is all that equity in such case requires. (*Pothier's Traite des Oblig.* No. 520.) " The other debtors and sureties," to adopt the observations of *Pothier*, " might, as well as the creditor, have taken care of the right of hypothecation which he has lost; they might summon

him to interrupt, at their risk, the third purchasers, or to oppose the decrees.   It is only in the case in which they may have put the creditor *in default*, that they may complain that he has lost his hypothecation."

Nor have *Cheesebrough and others* any peculiar equity on their part, to entitle them to set up the discharge of the first mortgage as an equitable bar to contribution.  They came in as purchasers at the sheriff's sale long after the discharge had taken place, and with notice of that fact, and of the existence of the second mortgage.   They were, accordingly, duly apprized of the condition of the subject which they purchased, and they had even taken the advice of council, whether the second mortgage was a valid and subsisting encumbrance.   And, before the commencement of their suit, they had admitted its validity by offering to contribute to its discharge, and actually tendering in money what they deemed their just proportion.   Under all these circumstances, they have no equity as against the second mortgage ; and I am of opinion, on every view of the point, that the mortgage is not discharged, and that the owner of it is entitled to have it satisfied out of the lots which it originally covered.

2. The rule of contribution between the parties, as owners of the different lots, must be the actual relative value of the lots, and this value is to be ascertained by the testimony of witnesses, in preference to estimating it by the price at which they were respectively purchased at the sheriff's sale.   Such sales are by no means a sure and certain test of value ; and I see no good reason why we should depart from the better standard, and adopt this precarious one, which is liable to constant variation, and must depend, in a great measure, upon contingencies.   The object of the principle of contribution is equality in the support of a common burden, and the law upon this point, as Lord *Coke* observed in Sir *Wm. Harbert's case*, is " grounded upon great equity ;" and equity has a regard to the *true* value, and not one depending upon

CHEESE-
BROUGH
v.
MILLARD.

contingency and speculation.    The rumour prevailing at the
sale, that the lots might be affected by some voluntary
conveyances of the original mortgagor, has been urged
as a reason for taking, in this instance, the auction price;
but I do not perceive the force of the argument.    The
rumour, it is to be presumed, affected, in equal proportion,
the price of all the lots, and leaves the general rule just as
applicable as before.    I shall, accordingly, as the best evi-
dence of value, adopt the relative valuations made by the
witnesses, *J. Van Schoonhoven* and *Mandeville*, and which
is as follows, viz :

| Lot No. 133 | $700 |
|---|---|
| 134 | 2,500 |
| 135 | 300 |
| 138 | 550 |
| 139 | 400 |
| 140 | 300 |

A reference must, therefore, be made to a master, to com-
pute the sum due from the plaintiffs, *Cheesebrough and
others*, as purchasers of lots No. 134. and 139., on this ratio
of contribution towards satisfaction of the principal and inte-
rest due on the first instalment of the bond, and also the
costs of advertising under the power contained in the said
mortgage.    The question of costs, in these suits, is reserved
until the coming in of that report.

                                    Decree accordingly.