Young v. Vough.

---

## YOUNG vs. VOUGH and others.

1. If a shareholder in a national bank places part of his shares in the hands of a third person to hold for him, under a secret declaration of trust, allows him to be elected a director, and himself votes for him, and allows him for years, although he owns no other shares, to take the oath required by the National Banking Law, that he is the bona fide owner of such stock, and declares that one of his objects in doing so is to give him credit and aid him in business, this is such fraud as will estop him from denying that such actual holder was the owner of the shares, as against a creditor who trusted him on the faith of being such owner.

2. A by-law of a national bank, declaring that no shares shall be transferred while the holder is indebted to the bank, is authorized by the act of Congress, and is a reasonable by-law; and any attempted transfer by the shareholder while indebted to the bank, is void. And an endorser who pays the note by which such debt is created, is subrogated to the rights of the bank as against such shares of its capital stock.

---

Argued on final hearing, upon pleadings and proofs.

*Mr. Vanatta,* for complainant.

*Mr. Shipman,* for defendant Mattison.

THE CHANCELLOR.

The complainant seeks to compel the First National Bank at Washington, in the county of Warren, one of the defendants to this suit, to transfer to him on their books, ten shares of their capital stock, sold to him by the sheriff of Warren county, on an execution against the defendant, Vough, July 10th, 1868. The defendant, Mattison, claims that these shares were lawfully transferred to him by Vough on the 2d day of June, 1868, before the judgment, execution, or levy, under which they were sold by the sheriff.

Mattison is a director and the principal stockholder of the bank, and had been so from its organization, in 1864. Vough had been a director, and had held thirty shares of the stock from or shortly after the organization of the bank until June 2d, 1864. Mattison, who was the chief promoter of the organization, had desired to take a controlling amount of the stock, but others, whom he desired to take part in it, objected to this, and to having anything to do with it, unless each shareholder was limited to one hundred shares. Mattison agreed to this, and took only one hundred shares in his own name, but obtained control of a larger amount of stock by procuring others to subscribe and hold the stock for him, he furnishing the money to pay for it. He procured Vough to subscribe for thirty shares, and furnished $3000 to pay for it, and took a declaration of trust from him, with an agreement to pay over the dividends, and, on request, to transfer the stock. The cover was continued by letting Vough draw and receipt for the half-yearly dividends, which he paid over to Mattison. Vough was elected a director at the annual elections, receiving Mattison's vote; and with Mattison's knowledge, at each election, took and subscribed the oath required by the act of Congress establishing national banks, that he was the *bona fide* owner in his own right, of at least ten shares of the capi-

tal stock of said bank, standing in his name on the books of
the association, and that the same were not pledged or
hypothecated for any loan or debt.

Young, the complainant, on the 4th of May, 1868, took
the note of Vough for $700, payable in one month, in part
payment of a note of $5000, which Mattison, Vough, and
one Canfield, had given him for mules, previously sold to
them. This was done with Mattison's knowledge. This
note was discounted at the bank, which held it on the 2d o
June, 1868. The transfer of the stock was made on that day
by Vough without the knowledge of Mattison. Vough went
to the banking-house in the absence of the cashier, who has
the custody of the transfer book, and requested the teller to
fill up a transfer for him. The teller told him it was no part
of his duty, it was the duty of the cashier. But upon being
urged by Vough, he produced the transfer book, filled up a
transfer of thirty shares to Mattison, which was signed by
Vough, and witnessed by Woodruff, the teller. Vough, at
the same time, drew out the whole balance of his account,
being about $300, and about this time failed in his business.

The cashier, on his return, and the directors of the bank,
at their next meeting, disavowed this transfer, declared it
illegal, and refused to allow it to be entered on the stock
ledger, or to issue certificates on it. Mattison, when informed
of the failure of Vough, called to inquire if a transfer had
been made to him.

The bank, at its organization, had adopted by-laws, framed
and reported by Mattison. One of these by-laws declares,
that no transfer of stock shall be made by any stockholder
while indebted to the bank, whether the debt is due or not.

The cashier and directors refused to permit and carry out
the transfer, on the ground that Vough was indebted to the
bank on this and other notes, and that the by-laws prevented
such transfer. When Young paid the $700 note on the 8th
of June, the cashier told him that if he paid off the note he
could have the same rights on the stock that they had.

The sale by the sheriff would, of itself, transfer the stock

to the complainant, if it had not been transferred to Mattison, and if there was no prior lien upon it by the bank.

The complainant contends, that the transfer to Mattison was both illegal and fraudulent. The illegality consists in its being a violation of the by-laws of the bank. The twelfth section of the act of Congress, 13 *Stat. at Large* 102, directs that the shares shall be personal property, and transferable on the books of the association, in such manner as may be prescribed in the by-laws or articles of association ; and section eight declares that the directors shall have power to regulate by by-laws the manner in which the stock of the association shall be transferred, its general business conducted, and all its privileges exercised and enjoyed.

A by-law of a money corporation, declaring that the debts of a stockholder shall be a lien on his stock, and that he shall not transfer it until such debt is paid, is held to be a reasonable and legal by-law. *Stebbins* v. *Phœnix Fire Ins. Co.*, 3 *Paige*, 350 ; *Angell and Ames on Corp.*, §§ 355 and 356, and cases there cited.

Mattison knew of this by-law, and cannot find shelter under the doubt somewhere suggested, whether a *bona fide* purchaser, who had no notice of such by-law, could be affected by it. This transfer then being made in violation of this by-law, and being disagreed to, and repudiated by the cashier and by the directors of the bank, was illegal. Vough, when he made it, and the teller, when he suffered it, knew it was illegal. And this illegality was not cured by the subsequent payment of the debt to the bank by Young. Vough was the principal and real debtor, and Young, as endorser, only surety. If notice of non-payment had not been given he could have been discharged. When he paid it he was entitled to all the rights of a surety, one of which is to be subrogated in place of the creditor, and to have all the collateral securities which the creditor had. That in this case was the lien upon the stock, and to prevent its transfer until the debt was paid by the real debtor. This doctrine of subrogation, derived from the civil law, and eminently just, is adopted

and enforced in courts of equity, both in England and this country. *Wright* v. *Morley*, 11 *Ves.* 23; *Robinson* v. *Wilson*, 2 *Madd.* 569; *Cheesebrough* v. *Millard*, 1 *Johns. Ch.* 413; *Hayes* v. *Ward*, 4 *Johns. Ch.* 130; *Clason* v. *Morris*, 10 *Johns. R.* 524; *Story's Eq. Jur.*, § 638.

At the time of the sale by the sheriff, this note had not been paid by Vough. It was a lien upon this stock, and the attempted transfer by Vough still continued unlawful and void as against Young.

The fraud charged by the complainant in his bill, that at the giving of this note Mattison represented that Vough was responsible, owned $3000 of stock in this bank, and was a director of it, has not been sustained by proof. Young himself testifies to it; but both Mattison and Vough, whom he says were present, deny it. The only fraud is that arising from Vough being held out to the world by Mattison as the owner of this stock, for the purpose of inducing others to give him a credit that he was not entitled to. Such fraud may operate by way of estoppel to prevent him from denying that Vough was the owner as against those who had been induced, by his conduct and representations, to trust Vough on the strength of it. Had the allegations of the bill been sustained, that Mattison, to induce Young to accept the individual note of Vough for a debt secured by two others, represented that Vough owned these thirty shares, and Young acted on it, Mattison would here be estopped from denying it.

For an estoppel *in pais*, it is necessary not only that the party to be estopped made false representations, and that some one acted upon them, but that the party making the representation should intend to influence the conduct of another, or should have reason to believe that it would influence such conduct. This was the result arrived at in the decision of the case of Kuhl v. Jersey City, made at the last February Term in this court, after a full consideration of the authorities.

Here Mattison, by the purchase in the name of Vough, by voting for him as director, and by permitting him to make the oath that he was the *bona fide* owner in his own right, and

acting with him as director, represented and held out Vough as the owner of these shares, free from his claim. But if he did this only to blind such stockholders as objected to his owning more than one hundred shares, or for the purpose of having a pliant tool in the board, he is not estopped; he must have done it for the purpose of giving him credit, and of inducing Young or the public to trust him, or must have foreseen that it would have that effect.

In this case, Robert P. Strader testifies that Mattison told him " that Vough was a young man and out of business, and he had done it to give him a credit and use him whenever he wanted to, and he would not have got that position if it had not been for him." Young testifies that Mattison told him that " he had helped him to get this stock, and lent him the money, and tried to help him along to give him a start and a credit."

From these admissions, and from the whole circumstances surrounding the affair, I am satisfied that one of the objects of Mattison, in his conduct and double dealing with regard to this stock, was to give Vough a credit he was not entitled to, and could not have otherwise got, and that he must have known and foreseen that it must have that effect. I think, too, the conclusion is inevitable that when he saw Young give up a good security for this $700 note, he knew that Young would not have done it but for the credit which owning this stock and being a director of the bank had given him, and that if he had not then been silent, but had disclosed the truth, Young would not have taken that note. His silence at that time confirmed and continued the impression made by his former false and fraudulent acts, and now must estop him from asserting the truth which he then concealed. The application of the sometimes unjust doctrine of estoppel appears to me in this to be most righteous.

The complainant is entitled to a decree that the bank shall transfer to him on their books the ten shares sold to him by the sheriff, and issue a certificate for them, and that the de-

fendant Mattison be forever debarred from claiming the same, and that the transfer made of them to him by Vough is void; and that the defendant Mattison pay the costs of the complainant.