## SCOTT *v.* MEAD *et al.*[1]

(*District Court, S. D. New York.* February 19, 1889.)

**1. BANKRUPTCY—FRAUDULENT CONVEYANCES—HUSBAND AND WIFE.**

The bankrupt, M.. in 1866, some years before his insolvency, had a judgment recovered against him by default by one L. Before that he had dealt in real estate in his own name, and then held some property on which the judgment was a lien. Thereafter, he continued and extended his real-estate business. making all contracts and obligations in his own name, but taking titles in his wife's name. In 1867 he bought several lots, paying for them out of his own means, taking title in his wife's name. In 1870 and 1871 he built five valuable houses thereon, doing all the business in his own name, and subsequently collecting the rents in his own name, and using them at his discretion. *Held* (1) that. there being no fraudulent intent as respects subsequent creditors at the time of the purchase of the lots. the wife, under the New York statutes, should retain the money invested in the lots, less the then existing judgment of L. (2) That the title taken in the wife's name was designed as a cover only for the husband's business; that the buildings were not within the same protecting statute as the lots: that they were not intended as a gift to her, and, if they had been. the gift was not reasonable in amount, as respects existing or subsequent creditors, and was invalid as against existing creditors and also as against subsequent creditors misled by the husband's apparent possession and ownership of the property

**2. EQUITY—CONVEYANCE SUBJECT TO LIEN OF JUDGMENT—MARSHALING ASSETS —RELEASE.**

M. having conveyed a house and lot subject to the lien of L.'s judgment. but without any agreement on the part of the grantee to pay it, it appeared that the amount of the judgment was neither deducted from the consideration nor part of the price. *Held*, that M. had no equity to require the grantee to pay L.'s judgment, and that the land did not become the primary fund therefor: and that L.'s subsequent release of that property did not prevent his recourse against the houses and lots in suit; the same as regards his release of other property at M 's request.

**3. CREDITORS' BILL—WIFE'S EQUITY—RENTS AND PROFITS.**

Upon decree charging the property with payment of the bankrupt's unsecured debts, *held*, (1) wife first entitled to the proceeds of a house and lot previously settled upon her in good faith. the proceeds being probably used by the husband in payment of debts incurred in the new buildings; (2) wife answerable for such rents and profits only as came to her hands.

In Bankruptcy. Creditors' bill.

For facts, see decision on demurrer to amended complaint, 9 Fed. Rep. 91.

*Nelson Smith* and *Coleridge A. Hart*, for complainant.

*Miller, Peckham & Dixon*, for defendants.

BROWN, J. The complaint was filed in August, 1880, by John H. Platt, assignee in bankruptcy of Abraham Mead, to have applied to the benefit of the estate five houses and lots on the corner of Fifty-Fifth street and Sixth avenue, the title to which had been taken in the name of Sarah J. Mead, the bankrupt's wife, alleged to be in fraud of creditors. Upon the death of Mr. Platt, Mr. Scott, the succeeding assignee, was substituted as complainant. The general facts as charged in the bill are stated in the decision on the demurrer to the amended complaint, (9 Fed. Rep.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

91,) where some of the other legal questions involved are also considered. It is unnecessary to repeat what is there stated. The answer denies all allegations of fraud.

The lots were bought by Mead in February and May, 1867, for about $31,000, of which $16,000 remained upon mortgage, and $15,000 was paid by Mead in cash, or its equivalent. The title was taken in the name of his wife, Sarah J. Mead. In 1870 and 1871 Mead built upon the lots five houses, at a cost variously stated by Mead as from about $115,000 to $165,000, begun in the latter part of 1869, and completed in 1871. Of this sum $76,000 was obtained upon bond and mortgage upon the same premises during the progress of the work; the rest was raised by Mead in various ways, from the sale of other real estate standing in his own or in his wife's name, from moneys borrowed by him, and by discounts which he obtained on accommodation notes at the Sixth National Bank.

Mead was by occupation a plumber. For some years prior to 1866 he had dealt to some extent in real estate, always taking title in his own name, excepting one house in Thirty-Sixth street, bought early in 1865, where he resided for a number of years, the title to which was taken in his wife's name, and, as he testifies, was "designed to be hers from the start." In 1866, Littlefield obtained a judgment against him by default for $3,183.83, which was a lien on two houses and lots in Forty-Third street, then standing in his name. He was afterwards allowed to come in and defend, the judgment meantime standing as security. The case was litigated by him until 1876, when final judgment was entered for $5,118.28. During this interval from 1867 to 1873 his speculations in real estate were gradually much enlarged. His obligations became heavy. All titles after 1866 were taken in the name of his wife or partner, except as to one house in West Twelfth street, in which there was an equity of $5,000. Down to the end of 1872 the real-estate market was rising, and he realized considerable profits, which were mostly reinvested in property heavily mortgaged. He was unable to carry this property through the depression which followed the panic of 1873. Except the buildings and lots now in question, it was all disposed of by sales at a loss, by foreclosures with deficiency judgments, or by reconveyances to the grantors upon nominal consideration. At the end of 1873 he became distressed for money, paid little or no accruing interest after 1874, was insolvent in 1875, and in 1878 was adjudicated a bankrupt. This suit was commenced within two years after the delivery of the assignment to the assignee. The statute of limitations is therefore no bar to this suit.

For the defendants it is contended that there is no proof of any fraudulent intent as respects any creditor, existing or subsequent; and that no relief can be had upon the Littlefield claim, because he voluntarily released sufficient real estate which was primarily charged with the payment of his judgment.

The Revised Statutes of this state provide that where a grant is made to one person, and the consideration therefor paid by another, no use or trust shall result in favor of the latter, but the title shall vest in the for-

mer, except only that "such conveyance shall be presumed fraudulent as against creditors, at that time, of the person paying the consideration;" and, "if a fraudulent intent is not disproved, * * * a trust shall result in favor of such creditors to the extent necessary to satisfy their just demands." 1 Rev. St. p. *728, §§ 51, 52.

The above provisions apply to the original purchase, and to Littlefield's judgment, which was a claim then existing. Mead, as I have said, put about $15,000 into this purchase in his wife's name. The statutory provisions do not apply to the improvements made upon the lots from three to five years afterwards, even though the land be held to belong to Mrs. Mead as against creditors. The husband's expenditures in building upon them valuable houses stand in no better position than a voluntary gift from husband to wife; and, as against creditors, if intended as a gift, it must stand or fall according to the rules applicable to such gifts, having reference to the debtor's means and a reasonable provision for his family, and the rights of creditors, existing and subsequent.

As respects the Littlefield claim, it is urged that a fraudulent intent is disproved by the circumstances, because the judgment was already abundantly secured, it is said, by real estate standing in Mead's name; because he had other personal means to a considerable amount; and because the inconveniences attending real-estate transactions in one's own name while a judgment in litigation attaches a lien upon them, furnish a perfectly innocent and justifiable reason for dealing in the name of another, without any presumption of a fraudulent intent. These considerations are entitled to much weight; and they would be deemed controlling were they not overcome by other evidence and by Mead's subsequent conduct. Besides the general evidences of his intention referred to below, the evidence demonstrates that Mead did not intend to leave any real estate standing in his name as a security for the Littlefield judgment any further than he could help; and that, long before Littlefield's final judgment was perfected, Mead withdrew his interest completely. He himself procured the release of one house in 1867 upon a nominal consideration. He sold the other to Mrs. Travis upon full consideration, in 1872; and a third in West Twelfth street, which was taken in his own name at the same time with the sale to Mrs. Travis, (probably as a substituted, though inadequate, security for the judgment to satisfy Mrs. Travis,) he sold with full covenants and warranty a few months afterwards, without reference to the judgment. This last house was sold on execution on the Littlefield judgment in 1876, realizing but $1,000, and leaving upwards of $4,000, besides 12 years' interest, still unpaid. My conclusion is that Mead not only meant to contest the Littlefield claim, but meant never to pay it if he could help it; and that his taking the subsequent titles in his wife's name was partly with this intent.

The two releases executed by Littlefield do not prejudice the claim under his judgment. The release of the house 103 West Forty-Third street in 1867 was evidently obtained by Mead himself, to enable him to convey that property, and thereby obtain a part of the consideration which was used to purchase the Sixth-Avenue lots in question. The re-

lease of the other house, 128 West Forty-Third street, was made in consideration of $200 paid by Mrs. Travis in February, 1873, about a year after its conveyance to her by Mead. This property had stood in Mead's name before the recovery of the judgment, and was undoubtedly sufficient security for the judgment. The conveyance was made "subject to all assessments for widening Broadway, which are to be paid by the party of the second part, [Mrs. Travis;] also subject to the lien" of the Littlefield judgment for $3,183.83.

It is contended by the respondent that this subject clause made this property the primary fund for the payment of the Littlefield judgment; and that the release of it by Littlefield estops him from making any subsequent claim under the judgment against Mead or his property. There are several reasons why this view cannot be sustained: (1) Even if the effect of the whole transaction between Mead and Travis was to make the land, as between them, the primary fund for the payment of the judgment, it would not have bound Littlefield, a prior lienor, unless he had notice of facts sufficient to constitute Mead a surety merely. *Ingalls* v. *Morgan*, 10 N. Y. 178, 187; *Cheesebrough* v. *Millard*, 1 Johns. Ch. 414; *Guion* v. *Knapp*, 6 Paige, 43; *Palmer* v. *Purdy*, 83 N. Y. 147. There is no evidence that Littlefield had any such notice, actual or presumptive. The case is wholly different from that of a specific lien like a mortgage. This judgment was a general lien merely; and, when Littlefield was applied to for a release, the only knowledge with which he was chargeable was simply that the property was subject to the lien of his judgment, like any other real estate that had belonged to Mead, without any obligation on his part to look to that property primarily or alone. The record of the subsequent deed was not constructive notice of its terms to Littlefield. *Cheesebrough* v. *Millard*, *supra*. Even if Littlefield had had knowledge of all the facts that now appear, it would have made no difference; for these facts do not show that the Travis property became the primary fund for the payment of Littlefield's claim, or that Mead became in equity a surety only. For (2) the deed does not say that Mrs. Travis was to pay the judgment; while it does state that she was to pay the assessments. Had the same intent existed as to the judgment, it would have been so expressed. (3) The conveyance was only "subject to the lien" of the judgment, not to the payment of it,—a wholly different thing. *Dingeldein* v. *Railroad Co.*, 37 N. Y. 575. (4) It is certain that the amount of the judgment was neither agreed to be paid by Mrs. Travis, nor deducted from the consideration money. Mead does not so testify on either point, as he would have done if either were true. The judgment then amounted with interest to about $4,400. Mead says he considered the property conveyed worth $18,000, or $2,000 more than the price named in the deed. But there is no evidence that Mrs. Travis so considered it; and, besides, she was to pay the Broadway assessments. But even this $2,000 difference is not half the judgment. Had it been understood that Mrs. Travis or her property was to pay the judgment, the whole amount of it would have been deducted from the consideration money; and Mead does not say that anything was deducted. And if the

purchase price was made less in consequence of the judgment, Mead would have taken some agreement from Travis to pay it. No such agreement was taken; nor is it probable that Mead would have continued an active litigation, as he did for several years afterwards, simply for Mrs. Travis' benefit.

The right of a debtor to make a particular fund the primary fund for payment of a debt is a purely equitable right. It rests either upon express contract, or upon the consideration of the transaction that raises such an equity Where the debtor's lands, for instance, are sold on execution, subject to a prior mortgage, the purchaser is presumed to have bought only the debtor's equity above the mortgage, and to have paid the consideration for that equity only; and the land therefore becomes thereafter the primary fund for the payment of the bond and mortgage. *Tice* v. *Annin*, 2 Johns. Ch. 128; *McKinstry* v *Curtis*, 10 Paige, 503; *Vanderkemp* v. *Shelton*, 11 Paige, 34. In this case there was neither any such agreement, nor any abatement or deduction from the consideration in Mrs. Travis' purchase, such as to give Mead any equitable right to have her property pay the judgment. He has no such equity. Littlefield's release of that property for $200 was therefore immaterial. Had the release not been given, and had Mrs. Travis been compelled to pay the whole judgment, she would have had a right to an assignment of the judgment for her benefit, to have it enforced against Mead in any legal or equitable proceeding like the present. *Ingalls* v. *Morgan, supra*. It is not improbable that this subject clause was inserted in the deed through the caution of Mead's attorneys for the very purpose of giving him the unquestioned right to litigate Littlefield's claim, and to prevent the grantee from either discharging the judgment, or claiming that the covenant against incumbrances was broken as soon as the grant was made, which otherwise might have been done. See *Barnes* v. *Mott*, 64 N. Y. 397, 400, 402. The defense that the Travis property became the primary fund was not pleaded; and very likely all the obtainable evidence pertinent to the question may not have been produced. It is possible that some agreement was taken by Mrs. Travis from Mead in reference to that judgment, and that the title to the house in West Twelfth street, which he had bought for $5,000 cash over the mortgage at the same time with the Travis deed, both being acknowledged on the same day, was designed to be a substituted security so far as to allay any apprehensions of Mrs. Travis. I do not credit Mead's statement that he believed the Littlefield judgment was "arranged upon the Travis sale," except in some such way as the above. He afterwards continued taking titles in his wife's name precisely as before, though the business was intended as his own. Upon the original purchase I must therefore hold that the Littlefield judgment attaches as a statutory trust.

2. *The buildings.* If Mead's improvements on the lots had been intended as a gift to his wife, its validity as against creditors would be determined in reference to the amount of his means thus diposed of, his other property at the time, his existing indebtedness, the reasonableness of the gift as a provision for his wife, and the use afterwards made of it,

as respects creditors, existing or subsequent. The evidence, however, satisfies me that neither the lots nor the buildings were intended as a gift to Mrs. Mead, or really to become her property, as between her and her husband. Her name was a mere cover for Mead's own business. In his numerous purchases after the Littlefield judgment, all contracts were in his own name. Payments were made with his own checks. The receipts on sales of property standing in his wife's name, were deposited in his own bank. All the rest of his real-estate transactions (except the house in West Thirty-Sixth street, purchased in 1865, above referred to) were acknowledged to be substantially his own. Even the mortgages of $24,000 and $20,000, given by Fitzgerald and Bradley on a sale of lots in Mrs. Mead's name, were stoutly claimed by Mead to be his, apparently supposing that the mortgages had been given to him, whereas they were in fact executed to his wife; other persons, however, being interested therein. There is nothing to distinguish the purchase and holding of the lots in question at the time they were bought, or the buildings built thereon in 1870 and 1871, from the many other real-estate transactions managed in the same way. Mead stated, in answer to the inquiries of some of the tenants, that this property was put in Mrs. Mead's name on account of the Littlefield judgment, and when that was out of the way, that it was to be turned over to him. He usually spoke of this property as his own, and so stated to many persons. He had the entire management of it, and until his insolvency deposited the rents in his own bank-account. Some general statements that Mrs. Mead had property or notes of his, representing means of her own, on account of which the property in question was bought, find no corroboration. No such notes are produced. Mrs. Mead was not called as a witness to verify this or any other claim in her favor. The inference is that she could testify to nothing which would support her case. I must find, therefore, that none of these transactions save that of the house in West Thirty-Sixth street were designed as gifts at all, and that the use of Mrs. Mead's name was nothing but a cover for her husband's interests. Doubtless these facts would in no way prejudice the legal title of Mrs. Mead and her heirs as against Mead himself, or persons claiming merely in privity with him. It is otherwise as respects creditors, where the real intent and object of the transaction are of prime importance. In such cases, if the transfer is a mere cover for the debtor's own use, and not intended to give the transferee any beneficial interest, it is void as to existing creditors, and equally so as to subsequent creditors, when employed to their prejudice, and to mislead them, except in so far as our statute in regard to trusts in lands prevents; and, as above stated, the statute has no application to what Mead subsequently invested in the buildings.

The amount invested by Mead in the houses cannot be determined within $50,000. Mead's sworn statements at different times differ by more than that sum. His check-books, which would have furnished valuable *data* as to this and other matters, have been kept concealed. He had access to them himself; but he refused to disclose where, or un-

der whose control, they were, or by whom he had himself been permitted to see them when desired. His last testimony was from memoranda made up by him, from which he read during his examination before the notary; but he refused to produce these memoranda for inspection or cross-examination by the opposing counsel. His earlier statement, made some years previous on affidavit, was that the buildings cost $169,000; next, that the buildings cost $128,484.50; lastly, that the buildings and nine lots cost $142,596.13; which, deducting $29,500 for the nine lots, would leave $113,096 for the buildings. As $76,000 only was raised by first mortgage on the property during the progress of the work, the amount raised from other sources must have been from $37,000 to $93,000.

Mead states that he was worth at that time from $75,000 to $150,000, and did not owe over $10,000. On cross-examination he fails to show with any definiteness property worth over $50,000 or $60,000, all told, except such as rested on mere estimate or conjecture, including what stood in his wife's name, aside from the house in Thirty-Sixth street. The explanation given of his failure, and the fact that upon his bankruptcy he had no assets, and owed at least $72,000 of unsecured debts, (excluding all of the alleged debt to James C. Mead of $32,000, excepting $8,000,) confirms the belief that practically all that he had above what he owed was invested in these houses. He states that his failure was caused by the shrinkage of real-estate values; and that, after 1873, the loss of cash invested therein was, all told, $186,535. Other parts of the evidence, however, show that his receipts from profits on wholly new transactions after the houses were all built in 1871, and from mortgages on the property in question, together with the debts unpaid and unsecured at the time of his bankruptcy, amounted to from $193,000 to $210,000, which is made up as follows: Additional sums raised on mortgage of the property in question after 1872, (amount per schedules, $155,750; per deed to J. C. Mead, $172,150,) $65,650 to $82,150; profits on lots bought from and after the summer of 1871, (McKee, Andrews, Beer, Gillies, Burns,) $55,552; debts unpaid, $72,000; making altogether from $193,000 to about $210,000; or from $7,000 to $24,000 more than all his losses, without counting the net rentals received by him from this property during many years. Assuming that all these net rentals—some $5,000 or $6,000 a year—were consumed in his expenses of living, (certainly a liberal allowance,) and that he earned nothing in his plumbing business from 1871 to 1878, it would seem, considering that his schedules show no assets, that unless some considerable assets were concealed at the time of his bankruptcy, he and his wife together, aside from the Thirty-Sixth street house, had nothing in 1870 and 1871, over his debts, except what was put into this property; and that, whatever his apparent property may have been, it was really absorbed in paying a part, but not all, of his indebtedness at that time in its continued and substituted forms. As to the amount of his indebtedness, Mead testifies that it did not exceed $10,000 when he began building, including the Littlefield judgment and Haight's claim, which

are still unpaid. From this, however, is evidently excluded his obligations on bond and mortgage, which would amount to a great deal more, The proof of debts in bankruptcy shows only two existing at that time, viz., those of Littlefield and Haight, amounting together, with interest, to about $6,000, as to which debts these transactions are plainly invalid. Besides those debts there are others proved to the amount of about $30,000 for moneys loaned to Mead, mostly upon notes dated in 1872 and 1873 But the evidence indicates that a number of these were for loans obtained previously,—how far back cannot be stated. To some extent they were probably substitutions for previous debts. No books of account were kept, and the check-books, which might have thrown light on this matter, have been concealed. A considerable amount was alleged to have been loaned by James C. Mead, running back prior to 1870; and from that year downward Mead appears as a borrower from his friends, and more and more from his bank, upon discounts of accommodation paper,—in November of 1870, $6,000; in November, 1871, $10,000; in November, 1872, $21,000; May, 1873, $35,000; July, 1873, $41,000. During 1873 the bank held security for these loans on the lots in question. These debts to the bank were discharged on the execution of the new mortgages above referred to in the latter part of 1873.

Mrs. Mead had no claim upon her husband for money or property brought to him upon her marriage, or through her family. The contrary suggestions made by Mead in the earlier part of the examination were afterwards disproved. She had no estate of her own, and received from her father only $460, which was but a repayment of what Mead had invested in furniture. I accept Mead's testimony that the house bought in 1865, and taken in Mrs. Mead's name, "was intended to be hers from the start." It was their place of residence; it was a reasonable provision for her at that time; it was not prejudicial to Mead's existing creditors, and was not used to mislead subsequent creditors. When the buildings on the lots in question were commenced, the house in Thirty-Sixth street was worth, as Mead says, $30,000. It was sold in 1873 for $31,000, netting $22,500 over the mortgage. I shall sustain this provision for Mrs. Mead to the amount of $22,500, considering that sum as practically turned into the Fifty-Fifth street property, where the family afterwards went to reside.

The subsequent use of the property in question by Mead was such as legally subjects it to the claims, not only of his existing creditors, but of subsequent ones misled by it. Mead alone was in apparent possession, as he undoubtedly had the sole management and control of it. He appointed agents of the property, who understood him to be owner. He usually spoke of it as his; made some long leases of it in his own name; and received and used all the rents, and contracted all debts in reference to the property. It was a valuable property. It gave him a reputation for wealth; and, in my judgment, was the backbone of his credit. The evidence shows that many of those who loaned him money did so on the faith of his supposed ownership of this property, to several of whom he

spoke of it as his, as he was generally accustomed to do. His partner and his agent supposed that it was his, and that it stood in his name of record. There can be no doubt that at that time, and for several years after, he considered the property as practically his, and so treated it. Mrs. Mead is chargeable with full knowledge of this course of dealing, and full assent to it. As a mere cover, she in no way interfered. She now offers no evidence to the contrary. Both are bound by the position practically assumed during the time when these subsequent debts were contracted on the faith of Mead's ownership. To permit a contrary position to be taken now on the strength of a merely nominal legal title in Mrs. Mead, which was originally intended only as a cover for Mead's use, would be to defraud the creditors misled by it. Any such attempt to change front afterwards is strong evidence, and ought to be interpreted as proof, of a fraudulent intent at the start. The cases are numerous showing that subsequent creditors thus actually or constructively misled are entitled to relief against such transfers, as much as creditors at the time. *Savage* v. *Murphy*, 34 N. Y. 510; *Case* v. *Phelps*, 39 N. Y. 164; *Sedgwick* v. *Place*, 12 Blatchf. 163; 179, 95 U. S. 3, *Shand* v. *Hanley*, 71 N. Y. 319. The cases of *Carr* v. *Breese*, 81 N. Y. 584, and *Graham* v. *Railroad Co.*, 102 U. S. 148, 153, 160, are inapplicable, the circumstances being quite different.

Mead's investment of his money in building on his wife's lots, when the intent of both was that Mead should have all the fruits of it from rentals or the proceeds of sales or mortgages, as the facts here prove that he did have to a considerable extent, in part execution of the trust, is virtually a "transfer" of Mead's personal assets to Mrs. Mead "in trust for his use;" and as such is by the statutes of this state "void as against creditors, existing or subsequent." 2 Rev. St. p. *135, § 1; *Curtis* v. *Leavitt*, 15 N. Y. 9, 132, 148, 149; *Wilson* v. *Robertson*, 21 N. Y. 591–594; *Young* v. *Heermans*, 66 N. Y. 381; *Dewey* v. *Moyer*, 72 N. Y. 70, 76, 103 U. S. 301. The statute applies to "all transfers, verbal or written." This expenditure was a "verbal" transfer of his means. That it was in trust for his "use" is as clear to me as if it had been declared in writing. Though a trust in lands cannot be created by parol *inter partes*, this does not apply to trusts for creditors, by operation of law; nor, I think, to moneys laid out on another's land, but for one's own use; nor to the proceeds to be derived therefrom, when such was the common intention. Section 1, p. *135, and section 2, p. *137, N.Y Rev. St., are thus harmonized. To a considerable extent the real trust has been executed in the application of rentals and of the moneys raised on mortgage of the property to the security or payment of Mead's debts at the close of 1873 and subsequently. In either point of view, subsequent creditors misled are entitled to relief.

When Mead's insolvency became certain in 1875, the insecurity of this property, though standing in his wife's name, became apparent. It was accordingly conveyed to his cousin, James C. Mead, of Sing Sing, in June, 1875, for the consideration as stated in the deed of $300,000, subject to mortgages for $172,150, and taxes of 1874. A memorandum of

Mr. Mead's of the year previous included it among his "effects," and stated its estimated value at $350,000, *i. e.*, from $125,000 to $175,000 above the incumbrances upon it.    Under this deed the ownership of the property was claimed by James C. Mead from June, 1872, till his death, in 1884, after which it was first learned in this suit that a reconveyance, not recorded, was executed by James C. Mead to Mrs. Mead on the day after the deed from her to him, and placed in the hands of a relative; the transaction being as security to James C. Mead for a balance of about $8,000 owing to him by the bankrupt.    In the mean time the bankrupt had been collecting the rents of the property under a power of attorney from James C. Mead.    The execution of this deed had been kept concealed through long examinations of both James C. Mead and Abraham Mead, and has led to no small amount of prevarication.    The complaint charges that the conveyance to James C. Mead was in fraud of creditors; and there can be no doubt that such was its actual intent.    The reconveyance to Mrs. Mead has since been delivered.

Upon all the testimony, I do not find that at the time of the original purchase of the lots there was an actual and positive intent on Mead's part to hinder, delay, or defraud any creditor except Littlefield, whom he did by this means intend to hinder and delay in the collection of his debt.    But I do find that the subsequent investment by Mead in 1870 and 1871 of a large amount of his means in the erection of houses on lots standing in his wife's name was greatly in excess of what was legally justifiable as a provision for her, having reference to his then existing means, and the uncertain and speculative nature of the chief business in which he was engaged, and the large obligations he had assumed in it, and the still larger ones he soon after assumed; that neither this investment, nor the original purchase, was intended as a gift to Mrs. Mead, but was a mere trust for his own use; that the provision previously made for Mrs. Mead, which is herein sustained to the amount of about $30,-000, was all that his circumstances warranted; and that the investment in these houses of so large a part, if not the whole, of his means over and above his unsecured liabilities, and his subsequent possession and use and representation of the property as his own, upon the faith of which subsequent loans were made to him, were incompatible with the rights and interests of creditors misled, and were in law fraudulent as to them; as well as void under the provisions of the Revised Statutes of this state.

The complainant is entitled to a decree declaring the original purchase of the lots subject to a trust for the payment of the amount now due and owing upon the Littlefield judgment; (2) the balance of the amount invested by Mead in the original purchase of the lots, after deducting the above, will go to Mrs. Mead, together with the sum of $22,500, the net proceeds of the Thirty-Sixth street house; (3) that there be next paid from the proceeds of the property the rest of the debts as they now stand proved against Mead in the bankruptcy proceedings *pro rata;* excluding, however, therefrom the debt to Maclay for a deficiency judgment on foreclosure.    The presumption from the circumstances, and the ordinary well-known course of business in this city, is that Maclay's bond and

mortgage were not taken upon any personal credit of Mead, or of the property in question; and there is no evidence or suggestion to the contrary. If the proceeds of the sale of the property are insufficient to satisfy the above sums in full after the payment of incumbrances existing thereon at the time the complaint herein was filed, together with any subsequent taxes or assessments, the defendants will be directed to account for the rents and profits received, so far as necessary to pay the above amounts in full, with interest and costs, (*Loos* v. *Wilkinson*, 110 N. Y. 210–215, 18 N E. Rep. 99;) and such rents and profits, so far as received by Mrs. Mead, will be deducted from the amount above reserved for her benefit, if not otherwise collectible, and that be necessary, in order to made good the amounts due upon the other claims allowed herein, together with costs and disbursements of suit.