CHARLES CONSTRUCTION COMPANY, INC. & another *vs.*
LEISURE RESOURCES, INC. & others.

Suffolk.    April 18, 1973. — February 20, 1974.

Present: ROSE, KEVILLE, & ARMSTRONG, JJ.

*Release.  Marshaling.*

In the circumstances, where it appeared that fire insurance proceeds payable to the insured were more than enough to pay indebtedness of the insured to both of two secured creditors, each of which had rights in an escrow fund established by a part of the insurance proceeds, and that the senior of the two creditors, knowing of the junior creditor's interest, participated in an arrangement, not participated in by the junior creditor, having the effect of releasing to unsecured parties a remaining balance of the insurance proceeds large enough to pay the junior creditor's claim and of forcing both of the two creditors to look for satisfaction of their claims to the escrow account, the amount of which was less than the junior creditor's claim, it was held that in equity the junior creditor had priority over the senior creditor in the escrow account and was entitled to the full amount thereof.  [756-762]

BILL IN EQUITY filed in the Superior Court on March 25, 1971.

The suit was heard by *Sgarzi,* J., on a master's report.

*Henry Gesmer* for Charles Construction Company, Inc.

*Harry Pollack* (*Julius Thannhauser* with him) for United States Trust Company, intervener.

ARMSTRONG, J.    This is a bill to reach and apply the proceeds of six insurance policies payable to Leisure Resources, Inc. (Leisure) to satisfy an alleged indebtedness of Leisure to Charles Construction Company, Inc. (Charles). The United States Trust Company (the Bank) was allowed to intervene as a party plaintiff in the proceeding, claiming

an interest in the proceeds of two of those policies.[1] Charles appeals from a final decree entered upon a master's report awarding $31,818.18 to the Bank and $2,784.09 to Charles.

The facts established by the master's report are scanty in many respects but are nevertheless somewhat complex. Charles performed construction services worth $34,845 on Leisure's Merrimack Valley Country Club. On October 20, 1970, the clubhouse was destroyed by fire. At that time it was insured against loss by fire for $220,000, $200,000 of which was underwritten by the Hartford Fire Insurance Company (Hartford) and the Aetna Casualty and Surety Company (Aetna). On March 25, 1971, Charles brought the present bill to reach and apply the insurance proceeds up to the amount of the alleged indebtedness and to enjoin the insurance companies from paying and Leisure from receiving or encumbering the proceeds to the extent of $40,000. A temporary restraining order and then a preliminary injunction were issued to that effect. Pursuant to a stipulation entered into by Charles, Leisure and the defendant insurance companies, an interlocutory decree was entered on April 12, 1971, dissolving the preliminary injunction upon the delivery of an insurance company draft or drafts totaling $35,000 into a joint escrow account, with the respective attorneys for Charles and Leisure to serve as escrow agents. The decree further provided for the discharge of the insurers upon issuance of the draft or drafts. This stipulation was executed prior to the filing of answers by the insurers and presumably prior to final settlement between Leisure and the insurers. There is nothing in the record to indicate any agreement between the parties as to the expected contributions of the various insurers towards the escrow account or as to whether Charles knew or had reason to know that some of the insurance proceeds might be otherwise encumbered.

---

[1] There is nothing in the record to indicate that Charles opposed the motion to intervene, nor did Charles argue on appeal that the motion was improperly allowed. See *Barry* v. *Abbot,* 100 Mass. 396, 398 (1868); *Check* v. *Kaplan,* 280 Mass. 170, 178-179 (1932).

On October 21, 1970, the day following the fire, Leisure had executed an assignment of $70,000 in proceeds of the Hartford and Aetna insurance policies to the Bank as security for a $25,000 loan, as evidenced by a promissory note. Approximately three weeks later, Leisure executed a second promissory note of $45,000 to the Bank.[2]

In April, 1971, some time after the April 12, stipulation, Leisure and the Bank executed an undated instrument denominated an "Authorization" by which the Bank released the insurance companies "from any obligations and/or responsibilities under any assignment of the insurance proceeds ... predicated [sic] that they will include ... [the Bank] as a payee on a settlement draft totalling Thirty-Six Thousand Five Hundred ($36,500) Dollars, and having a check in the sum of Thirty-Five Thousand ($35,000) Dollars payable to [the joint escrow agents] ... with the understanding that ... [the Bank] shall file a petition to intervene in such action." An addendum attached to the "Authorization" released all the insurance companies, including one not joined as a defendant, from all other outstanding claims in consideration of a settlement of $107,500,[3] $97,727.27 of which was payable under the Hartford and Aetna policies. It is not clear from the master's report when the terms of this settlement were arrived at, but the brief for the Bank indicates that the settlement was agreed upon some time in March, 1971.

---

[2] The record does not disclose whether the Bank filed a financing statement in accordance with Article 9 of the Uniform Commercial Code (G. L. c. 106, §§ 9-302, 9-401, 9-402 and 9-403). Neither party mentions the code, which does not appear to be applicable. See G. L. c. 106, §§ 9-104(g) and 9-104(k); *National Bedding & Furniture Indus. Inc.* v. *Clark,* 252 Ark. 780, 782 (1972); *Universal C. I. T. Credit Corp.* v. *Prudential Inv. Corp.* 101 R. I. 287, 295 (1966).

[3] The distribution of the settlement proceeds was to be as follows: (a) $20,000 payable to the trustees of the Merrimack Valley Golf Club Trust; (b) $5,000 payable to Hale & Dorr, described as "escrow agents" in some unidentified connection; (c) $36,500 payable to the Bank; (d) $35,000 payable into the joint escrow account referred to above; (e) $7,500 payable to Leisure's attorney; (f) $3,500 payable "to Bernard Dwork, Attorney for Larkin & Glassman." The master specifically found that "there were no other assignments or secured claims in the insurance proceeds held by any of the persons referred to" in items (a), (b), (e), and (f).

Drafts from the various insurance companies dated April 26, 1971 (Hartford), April 27, 1971 (Aetna), and April 30, 1971 (two other insurance companies) totaling $34,602.27[4] were made payable to the order of Charles, Leisure and the joint escrow agents pursuant to the stipulation and interlocutory decree. This sum consisted of $31,818.18 in proceeds of the Hartford and Aetna policies and $2,784.09 paid by the other insurance companies. These funds were deposited in the escrow account some time after May 10, 1971. Insurance company drafts of the same dates totaling $36,085.23[5] were made jointly payable to Leisure, Leisure's attorney, the trustees of the Merrimack Valley Golf Club Trust, Hale & Dorr, and the Bank and duly negotiated to the Bank. These drafts were clearly issued as part of the consideration for the release contained in the "Authorization."

The master's report contained findings of Leisure's remaining indebtedness to the Bank in the amount of $33,915.37,[6] the balance due under the $70,000 in promissory notes, plus $4,409.07 in interest, and of Leisure's indebtedness to Charles of $34,845. In awarding to the Bank the $31,818.18 contributed by Hartford and Aetna into the escrow account the trial judge impliedly ruled that these funds remained subject to the assignment to the Bank and that the Bank was entitled thereto as senior encumbrancer. Charles contends that it should obtain all the funds in the escrow account.

Charles argues that the "Authorization" executed by the Bank should be construed to effect a complete release of the Bank's security in the insurance proceeds. We are inclined, however, to agree with the Bank's construction of the

---

[4] The record fails to disclose why the actual payment was $397.73 less than the amount set forth in the stipulation. As no party contends to the contrary, we assume with them that the payment satisfied the requirement in the stipulation.

[5] The total is erroneously stated as $36,084.63 in the master's report.

[6] This figure should be $33,914.77. See footnote 5.

document. While the "Authorization" did release the insurers from personal liability under the assignment, it made their release conditional upon a payment of $36,500 directly to the Bank and a payment of an additional $35,000 into an escrow account established in connection with this suit in which the Bank was about to intervene. From the Bank's point of view the latter condition would have served no purpose if its intention had been to release its claim in the sum deposited, and we believe any such interpretation of the "Authorization" would be unreasonable. See *Hill* v. *Whidden,* 158 Mass. 267, 274 (1893). Rather, we believe that the "Authorization" was intended to release the Bank's claims against Aetna and Hartford, but to retain the Bank's claim against the proceeds of the Aetna and Hartford policies which would be paid into the escrow account.

We do not agree, however, with the Bank's contention that the "Authorization," to which Charles was not a party, should be permitted to accomplish what the Bank intended to accomplish. We do not accept the proposition that because the Bank held senior rights in the security it was in effect at liberty to release a part of the security to the detriment of a creditor with a security interest junior to its own.

After the entry of the stipulation, and before the execution of the "Authorization," the total proceeds held by the insurance companies were sufficient to pay in full, or substantially in full (taking into account interest due to the Bank), the claims of both (and so far as the record shows, all) of the secured creditors. After the "Authorization" was consummated both secured creditors could look only to the escrow account for security for their respective claims. The "Authorization" had the effect of releasing approximately a third of the total insurance proceeds from the effect of any secured claims, and that third was in fact paid to persons not entitled to any preference. The Bank participated in the "Authorization," knowing that its effect would be to force two substantially fully secured creditors to satisfy

their claims from a diminished fund, sufficient to cover the claim of but one, and to permit the remainder of the proceeds to be paid to unsecured persons.

Under the equitable doctrine of marshaling, a senior encumbrancer whose claim is secured by two funds, one of which is also claimed by a junior creditor, may be required to pursue his claim against the fund not subject to the encumbrance of another, provided he may do so without detriment to himself. See *Carter* v. *Tanners Leather Co.* 196 Mass. 163, 166 (1907); *Broadway Natl. Bank* v. *Hayward,* 285 Mass. 459, 462-464 (1934); *James Stewart & Co. Inc.* v. *National Shawmut Bank,* 291 Mass. 534, 556-557 (1935); *Grise* v. *White,* 355 Mass. 698, 705-706 (1969). Pomeroy, Equity Jurisprudence (5th ed.) §§ 396, 1413 and 1414. While that doctrine has generally been discussed and applied in cases involving two funds, as in the *James Stewart* case, the reasons underlying the doctrine have equal application here. If a stakeholder pays a junior encumbrancer with funds subject to the paramount encumbrance of another, the paramount encumbrancer may ordinarily pursue his claim either against the stakeholder or against the funds thus wrongfully paid (see Gilmore, Security Interests in Personal Property, § 7.9); but here the paramount encumbrancer has authorized the stakeholder to make the payment into the escrow account, and has expressly released other security which in the hands of the stakeholder would have been available either to itself or to the junior encumbrancer. As a result the claim of the paramount encumbrancer in the security available in the escrow account must in equity be subordinated to the claim of the junior encumbrancer, to the extent of the security released. *Pitman Bldg. & Loan Assn.* v. *Wright,* 106 N. J. Eq. 47, 48 (1930). *Beckman* v. *Alberts,* 346 Ill. 74, 78-79 (1931). *Fidelity & Cas. Co.* v. *Massachusetts Mut. Life Ins. Co.* 74 F. 2d 881, 883 (4th Cir. 1935). See *Kidder* v. *Page,* 48 N. H. 380, 382-383 (1869); *Sherman* v. *Foster,* 158 N. Y. 587, 594-596 (1899); 55 C. J. S., Marshaling Assets and Securities, § 11, and Anno. 110 A. L. R. 65. See also

*Parkman* v. *Welch,* 19 Pick. 231, 238 (1837), and *Clark* v. *Fontain,* 135 Mass. 464, 466 (1883). Any other rule would be conducive to fraud.

If the insurance companies had funded the escrow account without the Bank's authorization, it must be assumed that Aetna and Hartford would have insisted on retaining enough of the proceeds to cover the assignment, as they would otherwise have been liable to the Bank for any deficiency. *Buttrick Lumber Co.* v. *Collins,* 202 Mass. 413, 420-421 (1909). And Charles could have insisted, under the two-funds principle, that the Bank first pursue its claim against the funds retained by Aetna and Hartford, rather than against the Aetna and Hartford funds in the escrow account. *James Stewart & Co. Inc.* v. *National Shawmut Bank,* 291 Mass. 534, 556-557 (1935). By its "Authorization" the Bank in effect told Aetna and Hartford that it would release its priority in the proceeds they retained (which in fact amounted to $32,727.27, nearly enough to fully cover Leisure's remaining indebtedness to the Bank), and would instead pursue its claim against the funds they would use to discharge their obligation to Charles. As the record does not disclose the reason for its so doing, we cannot say that the Bank acted fraudulently, but it is enough that the Bank acted with knowledge of Charles' interest. *Cheesebrough* v. *Millard,* 1 Johns. Ch. 409, 414 (N. Y. 1815). *Sherman* v. *Foster,* 158 N. Y. 587, 595-596 (1899). *King* v. *Milford Natl. Bank,* 168 Misc. 571, 573 (N. Y. Supr. Ct. 1938). As between the Bank which knew about and participated in the destruction of a part of the security and Charles which did not, we are of the opinion that the loss should be borne by the former, which acquiesced therein and without whose participation it would not have occurred.

As the insurance proceeds exceeded the total assignment to the Bank and the equitable attachment obtained by Charles (as modified by the stipulation) and as Leisure's indebtedness to Charles amounts to less than the total released from the proceeds to unsecured parties, but more

than the amount in the escrow account, Charles has priority in all funds in that account.

The final decree is to be modified in part (c) to declare that Charles is entitled to receive all the funds in the escrow account, and in part (d) to direct the payment thereof accordingly. As so modified, the final decree is affirmed.

*So ordered.*