JAMES STEWART & COMPANY, INCORPORATED, *vs.* THE NATIONAL SHAWMUT BANK OF BOSTON & others.

LIBERTY TRUST COMPANY, trustee, *vs.* THE NATIONAL SHAWMUT BANK OF BOSTON, trustee.

Suffolk. December 12, 1932, July 15, 1935. — September 12, 1935.

Present: CROSBY, FIELD, DONAHUE, LUMMUS, & QUA, JJ.

*Mortgage*, Of real estate: trust mortgage, Accountability of mortgagee to junior encumbrancers. *Res Judicata.* *Trust*, What constitutes. *Lien*, Equitable. *Contract*, Construction. *Marshalling.* *Subrogation.* *Bond*, To guarantee mortgage security.

Where, under a "loan agreement," money lent to an owner of real estate in another jurisdiction for the construction of a building thereon was paid by the lender, for advancement to the owner, to a bank which was mortgagee in trust under a first mortgage of the property given to secure bonds issued by the owner for the money lent, a decree in a suit in equity in that jurisdiction for foreclosure of a second mortgage, in which the several liens of the mortgagees, the building contractor and the architect on the property were adjudicated, in the circumstances did not make *res judicata* the subsequent claims of those parties to a portion of the loan not advanced by the bank to the owner and remaining in the bank's hands.

Neither by the terms of any instrument nor by force of the circumstances was the contractor above mentioned or the architect or the second mortgagee (whose mortgage had been given to secure a second issue of bonds) entitled to such money in the hands of the bank on the ground that it was held upon a trust for him or on the ground that he had an equitable lien thereon.

Such money in the hands of the bank was, by the terms of the first mortgage, additional security for the first issue of bonds, but was not security for the second issue, and therefore, the real estate having been security for both issues, the second mortgagee, after the bank as trustee under the first mortgage had been paid in full from the proceeds of a foreclosure sale of the real estate, was entitled in equity, on principles of marshalling and subrogation, to have such money treated as having been applied to the payment of the first issue of bonds, thus making an equivalent amount of the proceeds of the foreclosure sale available for application to payment of the second issue, and was entitled to such money in priority to the contractor and the architect as holders of junior liens on the real estate, the mortgagor and his general creditors; and such money therefore was not money of the mortgagor which the contractor and the architect could reach and apply to their claims against the mortgagor.

Such bank was entitled to deduct its compensation and expenses from such money in its hands; and was chargeable for interest on the money only at the rate specified in the "loan agreement," not at the legal rate, up to the date of final decree in a suit in equity by the second mortgagee to obtain the money.

While the decree in the suit in equity for foreclosure above described did not preclude the second mortgagee from later contending that he had a beneficial interest in a surety bond given by the mortgagor to the first mortgagee and conditioned upon the completion of the building upon the land and payment therefor, the second mortgagee had no such interest either under the terms of any instrument made in connection with the financing of the project or by implication from the general plan of financing, nor, in the circumstances, was the second mortgagee entitled to have the first mortgagee resort first to the surety bond under the doctrine of marshalling of assets or to be subrogated on that bond after the issue of bonds secured by the first mortgage had been paid out of the proceeds of the foreclosure; the first mortgagee was not accountable to the second with respect to the surety bond.

Two BILLS IN EQUITY, filed in the Superior Court on May 15, 1928, and February 13, 1931, respectively.

The suits were heard by *Fosdick*, J.

The cases were submitted on briefs.

*H. E. Warner & J. G. Palfrey*, for Liberty Trust Company.

*J. C. Reilly & T. Hunt*, for The National Shawmut Bank of Boston in the first case.

*E. F. McClennen & A. E. Whittemore*, for The National Shawmut Bank of Boston in the second case.

*H. R. Bygrave*, for James Stewart & Company, Incorporated.

*F. W. Crocker*, for the defendants Coolidge and others.

FIELD, J. These two suits in equity were heard together in the Superior Court. Both arose out of the operations of trustees doing business under an agreement and declaration of trust as the Washington Central Trust, dated as of June 1, 1925, and executed July 10, 1925, in connection with the purchase of land in Washington, D. C., and the erection of an office building thereon. The trustees were changed from time to time. The National Shawmut Bank of Boston became one of the trustees at some time between July 10, 1925, and April 1, 1926. They are herein referred to as the Washington Central Trust.

The first suit was brought by James Stewart & Company, Incorporated, against the Washington Central Trust, The National Shawmut Bank of Boston, Coffin & Burr, Incorporated, and certain other defendants, including Charles A. Coolidge, Henry R. Shepley, Francis V. Bulfinch, and Lewis B. Abbott, copartners doing business as Coolidge, Shepley, Bulfinch and Abbott, herein referred to as the architects, to establish a debt of the defendant Washington Central Trust to the plaintiff and to obtain an order that money in the possession of the defendant The National Shawmut Bank of Boston, as trustee under the first loan agreement, be paid to the plaintiff on account of the debt so established. The defendant architects sought by a cross bill to establish a debt against the defendant Washington Central Trust and to obtain an order that the money referred to in the plaintiff's bill be paid over to these defendants on account of the debt so established. The Liberty Trust Company was made a party defendant by an interlocutory decree and filed an answer in which it said that its only claim to the money in the possession of The National Shawmut Bank of Boston as trustee under the first loan agreement was as trustee under a second mortgage given by the Washington Central Trust, and that it was not properly a party defendant in the suit but, without waiving this contention, that the money referred to should be paid to it. And by amendment this defendant pleaded a final decree in a suit in equity in the Supreme Court of the District of Columbia as a defence to the claim of the plaintiff

and the defendant architects to the money in the possession of the defendant The National Shawmut Bank of Boston.

The second suit was brought by the Liberty Trust Company, as trustee under a second mortgage of property of the Washington Central Trust, against The National Shawmut Bank of Boston, as trustee under a first mortgage of such property, to require the defendant to account to it for a surety bond in the sum of $1,200,000 and the proceeds thereof and for money in the possession of The National Shawmut Bank of Boston, as trustee under the first loan agreement.

The trial judge made findings of fact in each case and ordered the entry of final decrees, and such decrees were entered. The decree entered in the first suit established debts of the Washington Central Trust to the plaintiff therein and to the defendant architects as copartners, ordered payments on account thereof by the defendant The National Shawmut Bank of Boston with interest at the rate of six per cent per annum from the date of the decree to the date of payment, and decreed that the Liberty Trust Company had no right or interest in any capacity in the trust fund described in the bill. The decree entered in the second suit dismissed the bill.

The defendants The National Shawmut Bank of Boston and the Liberty Trust Company appealed from the decree in the first suit and the plaintiff Liberty Trust Company appealed from the decree in the second suit. The evidence is reported.

The evidence was documentary including parts of a transcript of the testimony taken in another suit. Facts shown thereby include the following: The plan of financing the project of the Washington Central Trust provided for first mortgage bonds, second mortgage bonds and preferred stock. By a so called "Loan Agreement," herein referred to as the first loan agreement, dated as of June 1, 1925, executed and delivered July 10, 1925, by Coffin & Burr, Incorporated, herein referred to as the lender under the first loan agreement, the Washington Central Trust and The National Shawmut Bank of Boston as trustee under the

first mortgage, the lender agreed to lend and the Washington Central Trust agreed to borrow the sum of $2,500,000, to be evidenced by an issue of first mortgage bonds to that amount — the amount to be increased to $3,300,000 if the trust obtained additional land and the lender consented to the increase. The money lent was to be paid to the trustee and by it advanced on written order of the lender to the mortgagor from time to time in accordance with detailed provision of the loan agreement. There were provisions also that amounts advanced should "be used solely for the purpose of completing the acquisition of . . . property, including the discharge of encumbrances . . . and the construction thereon of the . . . office building and otherwise" as provided in the agreement and for the retention of money by the lender until ninety-three days after the completion of the building and until the lender had been furnished with a certificate that the building was completed and free from liens or the final payment would free it from liens. By an instrument, also dated as of June 1, 1925, executed by the Washington Central Trust and The National Shawmut Bank of Boston on July 10, 1925, herein referred to as the first mortgage, the former conveyed to the latter real estate in Washington, D. C., by way of mortgage upon trust to secure the payment of these bonds. By this instrument The National Shawmut Bank of Boston was authorized to act as trustee under the first loan agreement. The parties to this instrument also executed and delivered on April 1, 1926, an instrument, herein referred to as the supplemental indenture to the first mortgage, whereby the trust conveyed additional land to the trustee under the first mortgage as additional security in contemplation of the issue of additional first mortgage bonds. First mortgage bonds to the amount of $3,300,000 were issued.

By a so called "Loan Agreement," herein referred to as the second loan agreement, dated as of June 1, 1925, executed and delivered July 10, 1925, by the City Central Corporation, herein referred to as the lender under the second loan agreement, the Washington Central Trust and the Liberty Trust Company as trustee under the second

mortgage, the lender agreed to lend and the Washington Central Trust agreed to borrow the sum of $600,000, to be evidenced by an issue of second mortgage bonds to that amount — this amount in some circumstances to be increased to $800,000. By an instrument, also dated as of June 1, 1925, executed by the Washington Central Trust and the Liberty Trust Company on July 10, 1925, herein referred to as the second mortgage, the former conveyed to the latter real estate, subject to the first mortgage, by way of mortgage to secure the payment of these bonds. By this instrument the Liberty Trust Company was authorized to act as trustee under the second loan agreement. The parties to this instrument also executed on April 1, 1926, an instrument, herein referred to as the supplemental indenture to the second mortgage, whereby the trust conveyed additional land subject to the first mortgage to the trustee under the second mortgage in contemplation of the issue of additional second mortgage bonds. Second mortgage bonds to the amount of $796,500 were issued and were outstanding at the time of the hearing.

The first mortgage, following a similar provision in the first loan agreement, contained a provision for delivery, in the events which have happened, to the trustee thereunder of a bond in the penal sum of $1,200,000 to be executed by the Washington Central Trust as principal "and a responsible surety company or responsible surety companies . . . conditioned for the completion of the entire structure formed by the 'original building' and the 'addition' in accordance with the plans and specifications therefor, referred to in the Loan Agreement, and in accordance with the supplemental indenture or indentures," in the "form provided in the Loan Agreement." And the second mortgage, following a similar provision in the second loan agreement, contained a like provision for the delivery of a bond in the penal sum of $300,000 to the trustee under the second mortgage. Such surety bonds were executed and delivered on April 1, 1926. The sureties on both bonds were the same. There was default on both bonds.

The Liberty Trust Company, trustee under the second

mortgage, brought an action in this Commonwealth on the bond given to it, which has been disposed of by "agreement for judgment" and "judgment satisfied," and the sum of $325,500 has been paid by the surety companies to this trustee.

The National Shawmut Bank of Boston, trustee under the first mortgage, on October 19, 1928, brought in Pennsylvania identical actions on the bond given to it against each of the sureties thereon. In each of these actions there was, on March 18, 1929, a judgment for the plaintiff for $1,200,000 with interest on $132,000 from December 1, 1927, and on $1,068,000 from May 11, 1928. The defendant in each case appealed, but on June 6, 1929, the appeals were "withdrawn and discontinued" and entries made that the judgments were "satisfied."

In May, 1929, while these actions on the surety bond were pending in Pennsylvania on appeal, a first mortgage bondholders' protective committee entered into an agreement with the sureties on the surety bond whereby the committee was to procure a discontinuance of the actions thereon and entries of judgments satisfied, and was to deliver to the sureties the surety bond for cancellation, and the sureties were to buy at par with interest and expenses such of the first mortgage bonds as might be deposited with the committee. Bonds to the par value of $3,294,500 were so deposited. The sureties agreed with the trustee under the first mortgage that in consideration of its satisfying the judgments in Pennsylvania and surrendering the surety bond for cancellation they would save the trustee harmless against any claims on the part of first mortgage bondholders or other persons on account of its satisfying the judgments and delivering the surety bond to the sureties for cancellation. No money was received by the trustee under the first mortgage from the sureties.

On March 29, 1928, the trustee under the second mortgage brought suit in the Supreme Court of the District of Columbia against the trustee under the first mortgage, the Washington Central Trust, James Stewart & Company, Incorporated, the architects and others as defendants to foreclose

the second mortgage. Cross bills or counterclaims were filed by various parties including the trustee under the first mortgage — filed June 11, 1928 — James Stewart & Company, Incorporated, and the architects. A decree of foreclosure was entered on June 29, 1929, ordering a sale of the real estate covered by the mortgage and providing for the distribution of the proceeds and the relative rights and obligations of lien holders. By this decree it was adjudged that the Washington Central Trust owed the trustee under the first mortgage the principal of the first mortgage bonds, certain coupons and interest and for certain expenses and disbursements, and owed the trustee under the second mortgage the principal of the second mortgage bonds and certain coupons and interest and for certain expenses and disbursements. It was adjudged also that the first mortgage was a first lien and the second mortgage a second lien thereon and that James Stewart & Company, Incorporated, had a lien on such real estate superior to the claims of all parties to the suit other than the trustees under the first and second mortgages, and that subject to these liens certain other defendants, including the architects, were entitled to liens upon the real estate. It was ordered that the proceeds of a sale which might be made should be applied in the following order: (a) certain taxes, expenses of the sale and compensation and expenses of counsel for the trustee under the first mortgage, (b) the amount due and unpaid on the first mortgage bonds, (c) compensation and expenses of the trustee under the second mortgage, (d) the amount due and unpaid on the second mortgage bonds, (e) the sum of $196,297.48 to James Stewart & Company, Incorporated, (f) amounts due to other lien holders including the amount of $17,028.88, with interest, due to the defendant architects, and (g) the balance to the Washington Central Trust. The bill was dismissed as to the trustee under the first mortgage and the cross bills or counterclaims, other than that of the trustee under the first mortgage, including those of James Stewart & Company, Incorporated, and the architects, were dismissed as to the trustee under the first mortgage, the trustee under the second mortgage, the lender under the first mortgage and

the surety companies. Thereafter, on September 23, 1929, a sale of the real estate for the sum of $4,005,000 was confirmed by the court. From the decrees ordering the foreclosure and confirming the sale James Stewart & Company, Incorporated, the architects and certain other lien holders appealed. The Court of Appeals of the District of Columbia by a mandate dated June 19, 1931, affirmed these decrees. See *James Stewart & Co. Inc.* v. *Liberty Trust Co.* 50 Fed. Rep. (2d) 1008. On October 11, 1929, the report of the trustees appointed to sell the real estate was approved, the compensation of the trustees for the sale allowed, the retention of money to pay further expenses authorized, and the balance remaining in the hands of the trustees ordered paid in accordance with the decree of June 29, 1929. The proceeds of the sale in the hands of trustees to make the sale were sufficient to pay in full the amount due on the first mortgage bonds but were not sufficient for any payment on the second mortgage bonds or to any other lien holders. The amount due on the first mortgage bonds was paid by direction of the trustee under that mortgage to the order of the surety companies with the exception of the amount due upon such bonds for $5,500 which was paid to the trustee under the first mortgage. The first mortgage bonds have been paid and cancelled.

On January 26, 1931, there was in the possession of the trustee under the first loan agreement the sum of $90,098.92, being the excess over expenditures of money received by the trustee from the lender on account of the loan, and not paid to the mortgagor, and interest on balances of such money while on deposit to January 26, 1931. In fixing this amount the sum of $32,130.35 retained or paid by the trustee for services and expenses was included in the expenditures.

FIRST. As to the suit brought by James Stewart & Company, Incorporated.

This suit involves the disposition of the money in the possession of the trustee under the first loan agreement. The primary question in the case is whether the plaintiff

and the defendant architects, on the one hand, or the trustee under the second mortgage, on the other hand, is entitled to this money. By the decree appealed from the trustee under the first loan agreement was ordered to pay this money to the plaintiff and to the defendant architects with interest, and it was decreed that the trustee under the second mortgage had no right or interest therein. A secondary question is in regard to the amount for which the trustee under the first loan agreement is required to account.

A. The contentions on the primary question are these:

The plaintiff and the defendant architects contend in substance (a) that under the instruments in the events which have happened they are lawfully entitled to the money in the possession of the trustee under the first loan agreement on the ground that under the first loan agreement and the first mortgage, expressly or by implication, such money is held upon trust for them or subject to an equitable lien for their benefit, for the payment of the debts to them, respectively, of the Washington Central Trust, but (b) that if such money is not so held for the benefit of the plaintiff and the defendant architects they are entitled to reach and apply it as property of the Washington Central Trust to the payment of such debts. The trustee under the second mortgage contends in substance (c) that it is lawfully entitled to money in the possession of the trustee under the first loan agreement to apply to the payment of the second mortgage bonds on the ground that such money is held upon trust for the benefit of the holders of the second mortgage bonds or subject to an equitable lien for their benefit, or (d) that on principles of marshalling and subrogation it is entitled to have the money treated as applied to the payment of the first mortgage bonds with the result that a part of the proceeds of the foreclosure sale is available for application to payment of the second mortgage bonds.

The plaintiff had a written contract with the Washington Central Trust made September 15, 1926, for the construction of the building, which was in evidence in this

suit. And the defendant architects had an oral contract with the Washington Central Trust for services as architects in connection with such construction. The plaintiff has performed fully the terms and conditions of its contract to be performed by it and at the time of the foreclosure sale there were no liens of subcontractors, mechanics, laborers or material men who furnished labor or material in the construction of the building under the. contract between the plaintiff and the Washington Central Trust. It is not controverted that the Washington Central Trust under these contracts, respectively, owes the plaintiff $196,297.48 and the defendant architects $17,028.88. That these amounts were owed by the Washington Central Trust was adjudged by the decree in the present suit. And it is not controverted that the Washington Central Trust owes the trustee under the second mortgage on account of unpaid second mortgage bonds an amount in excess of the amount of the money in the possession of the trustee under the first loan agreement and any interest due thereon.

The foreclosure suit upon which the mortgaged property was sold was instituted by the trustee under the second mortgage. But the trustee under the first mortgage, which was also the trustee under the first loan agreement, filed an answer in the suit containing a counterclaim praying for foreclosure. The foreclosure sale which followed was a sale "pursuant to judicial proceedings" within the meaning of art. VII of the first mortgage, providing that the proceeds of such sale "together with any sums which then may be held by. the Trustee, under any of the provisions of this indenture as part of the Mortgaged Property" shall be applied to the payment of taxes, assessments and liens prior to the lien of the first mortgage, expenses, principal and interest of the first mortgage bonds, and that "any surplus remaining shall be paid over to the Mortgagors or to whomsoever shall be lawfully entitled thereto." And it was also a sale within the meaning of art. XI of the first mortgage which provides that "in the event that the Trustee shall sell the Mortgaged Property under the provision of Article VII hereof, it shall apply such money

together with any other moneys then held under the Loan Agreement as in said Article VII provided for the proceeds of such sale." The proceeds of the loan now in the possession of the trustee under the first loan agreement, therefore, being moneys "then held" under the loan agreement are to be "paid over to the Mortgagors [the Washington Central Trust] or to whomsoever shall be lawfully entitled thereto."

Though upon a sale in pursuance of judicial proceedings the money in the possession of the trustee under the first loan agreement, by the terms of the first mortgage, became distributable in the same manner as the proceeds of the foreclosure sale, it was by those terms distributable after the payment of the first mortgage bonds to the persons "lawfully entitled thereto," and it does not follow that the same persons are "lawfully entitled thereto" as were entitled to the proceeds of the sale. The provision for the payment of the money in the possession of the trustee under the first loan agreement to "whomsoever shall be lawfully entitled thereto" did not create rights therein but merely recognized rights created otherwise. The question, who is "lawfully entitled" to the money, must be determined in accordance with the terms of the first loan agreement, incorporating the terms of the first mortgage, under which it is held and the principles of law applicable to money so held.

The trustee under the first loan agreement claims no beneficial interest in the money in its possession after its proper charges have been deducted. Nor does the lender under that agreement or the subsequent holders of first mortgage bonds.

1. Neither the plaintiff and the defendant architects, on the one hand, nor the trustee under the second mortgage, on the other hand, is precluded by the decree in the foreclosure suit from making the contentions above stated. That decree did not determine affirmatively who was "lawfully entitled" to the money in the possession of the trustee under the first loan agreement. The present suit is brought on a different cause of action from the cause of action in the foreclosure suit — considered apart from the causes of action for which

the cross bills or counterclaims of the plaintiff and the defendant architects filed therein were brought. That suit was brought to enforce a lien on real estate and involved the determination of the rights of all lien holders in such real estate. But the present suit was brought in part to enforce a trust of, or liens on, the money in the possession of the trustee under the first loan agreement. Consequently the decree in the foreclosure suit — apart from the dismissal of the cross bills or counterclaims — was conclusive as to rights in this money only so far as the matter was actually tried and determined. *Foye* v. *Patch*, 132 Mass. 105, 110–111. *Eastman Marble Co.* v. *Vermont Marble Co.* 236 Mass. 138, 148. But it does not appear that this matter was so tried and determined. The decree in the foreclosure suit, except as it dismissed cross bills or counterclaims, purported merely to determine the amounts of the indebtedness of the Washington Central Trust to the trustees under the first and second mortgages, the extent of the liens of these and other lien holders on the real estate, the priorities among them and the disposition to be made of the proceeds of such real estate. Such determination did not necessarily involve the determination of the extent to which the lien holders had other security for the indebtedness to them of the Washington Central Trust. See *Burlen* v. *Shannon*, 99 Mass. 200, 202–203; *Giedrewicz* v. *Donovan*, 277 Mass. 563, 565.

The cross bills or counterclaims of the plaintiff and the defendant architects in the foreclosure suit were not brought for the same causes of action as this bill and cross bill. The former were brought, so far as here material, to establish rights in the property of the "joint enterprise" in priority to the first and second mortgages and for an accounting thereof and, particularly, to establish rights of the plaintiff and the defendant architects to have amounts which were, or should have been, retained by the lender under the terms of the first loan agreement applied to the payment of the indebtedness to these parties of the Washington Central Trust. The trustee under the second mortgage by its answer put in issue the allegations of the cross bills or counterclaims on these points. And the trustee under the first mortgage

and the lender denied that the lender had retained any money in its own possession under the loan agreement, but in answer to a call for discovery stated that the trustee under the first loan agreement had a sum of money in its possession under that agreement which it held subject to suit in this Commonwealth. And there was evidence in support of this statement. These are the only references in the record of the foreclosure suit to this money. The cross bills or counterclaims of the plaintiff and the defendant creditors were not brought specifically to establish rights therein and did not involve such rights unless such money was the property of a "joint enterprise" or money retained by the lender under the first loan agreement. This is not a case where the dismissal of a prior suit is a bar to the later suit because the objects of the two suits are the same, though they are brought on different theories. See *Mackintosh* v. *Chambers*, 285 Mass. 594, 597. Consequently a decree dismissing these cross bills or counterclaims was not an adjudication adverse to these parties with respect to such rights unless the matter was actually tried and determined. *Burlen* v. *Shannon*, 99 Mass. 200, 202–203. *Harlow* v. *Bartlett*, 170 Mass. 584. *Newhall* v. *Enterprise Mining Co.* 205 Mass. 585. And the record of the foreclosure suit, including the findings and rulings of the trial judge — which may be examined, see *National Foundry & Pipe Works* v. *Oconto Water Supply Co.* 183 U. S. 216, 224; *United States* v. *Eastern Transportation Co.* 59 Fed. Rep. (2d) 984, 985; see also *Hood* v. *Hood*, 110 Mass. 463; *Diebold Safe & Lock Co.* v. *Morse*, 234 Mass. 17, 21 — does not show that the matter of the rights of the plaintiff and the defendant architects in the money in the possession of the trustee under the first loan agreement was actually tried and determined on these cross bills or counterclaims. Obviously the dismissal of these cross bills or counterclaims was not an adjudication adverse to the trustee under the second mortgage with respect to any rights which it might have by way of trust or equitable lien in the money in the possession of the trustee under the first loan agreement.

2. The money in the possession of the trustee under the first loan agreement received by it from the lender there-

under is not held upon trust or subject to any lien for the benefit of the plaintiff or the defendant architects. No such trust or lien was created by the express provisions of the first loan agreement incorporating the terms of the first mortgage or by implication therefrom and none can be implied solely from the relations of the parties.

There was no direct contractual obligation of the trustee under the first loan agreement to the plaintiff or to the defendant architects. Contractual relations of the plaintiff and the defendant architects were solely with the Washington Central Trust. The plaintiff and the defendant architects, however, rely on the following terms of the instruments as creating trusts or liens for their benefit. There is a provision, already referred to, in the first loan agreement, that the proceeds of the first mortgage bonds and interest "shall be advanced to the . . . [Washington Central Trust] from time to time in accordance with the schedule of payments set out below and shall be used solely for the purpose of completing the acquisition of the above-described property, including the discharge of encumbrances, subject to which the property shall have been acquired, and the construction thereon of the above-described office building and otherwise as herein provided." The schedule of payments provided for advances, after prior advances which have been made, as follows: "Subsequent advances (except the final advance for which one hundred and fifty thousand dollars ($150,000), and the second and third interest instalments, for which one hundred and fifty thousand dollars ($150,000) shall be reserved) shall be made in monthly instalments on the fifteenth day of each month, beginning with the month of July, so far as possible, in such sums as are necessary to meet fifty per cent. (50%) of the sum in each case certified by Coolidge, Shepley, Bulfinch & Abbott, Architects, or other architects satisfactory to the Lender, as representing labor actually performed or furnished or material actually put in place in the erection of said building or upon the site and reasonably required in the progress of the work during the preceding calendar month, and may include

. . . such part of architects' and engineers' fees as is represented by the ratio of the labor performed and material furnished represented by such certificates, to the entire estimated labor and material cost." The plaintiff and the defendant architects also rely upon the provisions of the first mortgage requiring a completion bond as above set forth.

In connection, however, with these provisions of the instruments must be read provisions of the first loan agreement requiring the architects' certificates to include certain statements and the following provisions: "As a condition precedent to each such subsequent advance, there shall be presented to the Lender, together with the architects' certificates, vouchers showing the payment for all sums then due for all labor and materials included in certificates upon which all advances prior to the advance then requested were based, and evidence that funds necessary to pay the remaining fifty per cent. (50%) of the sum certified as due by each such architects' certificate is available." "All advances shall be paid when and as due, as hereinbefore provided by the Lender to the Trustee, and payment to the Borrower [Washington Central Trust] of any moneys advanced or deposited with the Trustee on account of the loan shall be made only on the written order of the Lender. The Trustee shall not make any advance to the Borrower unless it has received word from its counsel in Washington (by telephone) either immediately before or simultaneously with said advance that no notices of mechanics' or other liens have been filed or recorded or that if any such have been filed or recorded they have been discharged or that if the advance to be made is appropriately set aside and applied the premises will be free from such lien." "The final advance or payment which shall consist of the sum of one hundred and fifty thousand dollars ($150,000) retained or withheld from the proceeds of said Bonds, together with such other part of the proceeds of said Bonds, except interest, as may not have been previously advanced, shall be made ninety-three (93) days after the completion of the building on certificate of said architects approved as afore-

said, of the fact and date of such completion, and that the mortgaged property is then free from liens for labor or materials or that the application of the final payment or part thereof will clear the mortgaged property of such liens." The lender, however, might at its option request the trustee under the first loan agreement to discharge out of money in its hands any lien on the mortgaged premises. And it is provided also by the first loan agreement that in case of default by the Washington Central Trust the lender "at its election . . . may, but shall not be required to, complete the erection, construction and equipment" of the building, and that the trustee under the first loan agreement may carry out this authority if the lender does not elect to do so when requested by the trustee or if after the lender has so elected the trustee "elects to assume the said authority."

By the terms of the instruments, therefore, prior to the sale of the property, the advances made by the trustee under the first loan agreement from the proceeds of the loan were to be made to the Washington Central Trust except as the trustee was authorized at the request of the lender to discharge liens on the mortgaged premises, and the lender and the trustee were authorized if they so elected to complete the building. And though the first loan agreement prescribes the purposes for which money so advanced shall be used by the Washington Central Trust this agreement also provides specifically as to both the trustee and the lender that it "shall be under no obligation to see to the application of the proceeds of the loan."

Furthermore, the first mortgage, incorporated in the first loan agreement, provides as follows: "Nothing in this indenture, express or implied, is intended or shall be construed to confer upon or to give to any person or corporation, other than the parties hereto and the holders and registered owners of the Bonds, any right, remedy or claim under or by reason of this indenture or any covenant, condition, stipulation or agreement hereof; and all the covenants, conditions, stipulations, promises and agreements in this indenture contained by or on behalf of the Mort-

gagors shall be for the sole and exclusive benefit of the parties hereto and of the holders and registered owners of the Bonds."

The money here in question has not been advanced to the Washington Central Trust under the terms of the first loan agreement. Prior to the foreclosure sale the trustee under that loan agreement had advanced all amounts which the lender had authorized paid in accordance with architects' certificates. Payment of a comparatively small part of fifty per cent of the aggregate amount for which architects' certificates, conforming to the requirements of the first loan agreement, had been issued was not so authorized. With respect to further amounts due to the plaintiff from the Washington Central Trust, the architects, before the foreclosure sale, made certificates which did not conform to the requirements of this agreement. Consequently, before the foreclosure sale the Washington Central Trust was not entitled under the terms of the agreement to any advance by the trustee under the first loan agreement from the proceeds of the loan in the possession of that trustee. And there is no contention that the authorization by the lender of further advances to the Washington Central Trust was wrongly withheld.

From the terms of the instruments and the facts above set forth it follows that before the foreclosure sale the plaintiff and the defendant architects had no equitable interests by way of trust or lien in the proceeds of the loan in the possession of the trustee under the first loan agreement. The first loan agreement and the first mortgage disclose no intention to create such interests either expressly or by implication. On the contrary such an intention is negatived by the provision of the first mortgage above quoted. Moreover, the obvious purpose of the parties to these instruments was to provide for a loan to the Washington Central Trust and to furnish security therefor to the lender and subsequent holders of the first mortgage bonds. And even the provisions of the loan agreement fixing the purposes for which the money advanced to the Washington Central Trust should be used and making architects'

certificates that labor had been performed and materials furnished and that payments had been made for labor and materials included in certificates on which prior advances were made conditions precedent to advances were for the protection of the lender and subsequent holders of first mortgage bonds and not for the purpose of furnishing security to contractors or other persons supplying labor or materials. Indeed, an important purpose of the instruments was to protect the lender and subsequent holders of first mortgage bonds against the acquisition of liens on the mortgaged property by contractors or other persons supplying labor or materials. Compare *Ehrlich* v. *Johnson Service Co.* 272 Mass. 385, 390. Those instruments imposed no duty on the trustee under the first loan agreement to pay money to the plaintiff or to the defendant architects. Payments, unless at the election of the lender or the trustee, were to be made to the Washington Central Trust upon conditions which had not been performed prior to the foreclosure sale. See *Ehrlich* v. *Johnson Service Co.* 272 Mass. 385.

Even if the agreements embodied in these instruments had been for the benefit of the plaintiff and the defendant architects, none of these parties could maintain an action at law or suit in equity based thereon unless the case fell within some exception to the general rule that a beneficiary of a contract not a party thereto cannot sue thereon. *Central Supply Co.* v. *United States Fidelity & Guaranty Co.* 273 Mass. 139. And, since the agreements embodied in these instruments were not made for the benefit of the plaintiff and the defendant architects, these parties cannot prevail on grounds like those which have been recognized as creating exceptions to this rule. See *Ehrlich* v. *Johnson Service Co.* 272 Mass. 385, 389. There was no express agreement among the parties to these instruments that the money in the possession of the trustee under the first loan agreement should be held upon trust or subject to an equitable lien for the benefit of the plaintiff or the defendant architects. Compare *Boston* v. *Turner*, 201 Mass. 190. And this money did not by force of these instruments in equity and good conscience belong to the plain-

tiff or the defendant architects. *Pike* v. *Anglo-South American Trust Co.* 267 Mass. 130. See *Forbes* v. *Thorpe,* 209 Mass. 570, 580–581. Moreover no trust or equitable lien can be implied from any representation made by the parties to the instruments and relied on reasonably by the plaintiff or the defendant architects. If the plaintiff and the defendant architects relied on the terms of the instruments they were charged with notice of the provision negativing any intention to create rights in them.

Furthermore, the contract between the Washington Central Trust and the plaintiff and that between the Washington Central Trust and the defendant architects created no equitable lien for the benefit of the plaintiff or the defendant architects on the money in the possession of the trustee under the first loan agreement. Neither the contract between the Washington Central Trust and the plaintiff, nor, so far as appears, the contract between the Washington Central Trust and the defendant architects contained any agreement that payments to the plaintiff and the defendant architects respectively should be made out of this money, or any assignment of interests therein of the Washington Central Trust, so far as it had any, to these parties, or in fact any reference to this money. And there is no clear implication from the conduct and dealing of the parties to the contracts that it was their intention that equitable liens thereon should be created. See *Massachusetts Gasoline & Oil Co.* v. *Go-Gas Co.* 259 Mass. 585, 593–594, and cases cited.

3. The trustee under the second mortgage is not lawfully entitled to money in the possession of the trustee under the first loan agreement to apply to the payment of the second mortgage bonds on the ground that such money is held upon trust for the benefit of the holders of the second mortgage bonds or subject to an equitable lien for their benefit.

The trustee under the second mortgage was not a party to the first mortgage or to the first loan agreement in which that mortgage was incorporated. And neither the trustee nor the holders of the second mortgage bonds are entitled to the benefits of the agreements contained in

either of these instruments. Without considering other grounds for this conclusion it is sufficient to say that a contrary interpretation is precluded by the provision in the first mortgage already quoted, limiting the rights created by such ·mortgage and the benefits of the "covenants, conditions, stipulations, promises and agreements in this indenture contained by or on behalf of the Mortgagors" to the parties thereto and "the holders and registered owners of the Bonds." The bonds referred to in this provision are the first mortgage bonds. And even if the money in the possession of the trustee under the first loan agreement is within the definition in the first mortgage of the "Mortgaged Property" as "the land and premises . . . and all property of any and every kind which is now subject or becomes hereafter subject to this indenture or any supplemental indenture," the provisions of the first mortgage with respect thereto are not for the benefit of the trustee under the second mortgage. Moreover, even if the trustee under the second mortgage is a party to the first mortgage as an assign of the trustees of the Washington Central Trust within the provision defining the "'Mortgagors,' parties of the first part" in the first mortgage as the trustees of the Washington Central Trust "their successors in said Trust and their assigns," the trustee under the second mortgage is such an assign only to the extent that he became such by the terms of the instrument of assignment, the second mortgage. But the second mortgage though expressly made subject to the first mortgage did not purport to assign to the trustee under the second mortgage any interest legal or equitable in the money in possession of the trustee under the first loan agreement. And the definition of the "Mortgaged Property" in the second mortgage does not include such money.

In view of the express limitation upon the benefits of the first mortgage, the trustee under the second mortgage has no equitable rights in the money in the hands of the trustee under the first loan agreement by reason of the fact that the first mortgage and the first loan agreement were executed as a part of a general plan of financing the

construction of the office building. The instruments defining the rights and obligations of the various parties to the plan were drawn with great detail with the apparent intention of defining fully such rights and obligations. In these circumstances the omission from all the instruments of any specific provision that money in the possession of the trustee under the first loan agreement should be security for the second mortgage bonds is strong proof that no such result was intended. *Crimmins & Peirce Co.* v. *Kidder Peabody Acceptance Corp.* 282 Mass. 367, 378. Indeed, the limiting provision in the first mortgage, and a like provision in the second mortgage, may have been used particularly for the purpose of negativing the inference that any rights were created by implication from the plan of financing considered as a whole. The provision in each loan agreement that in case the lender elected to take over the construction of the building sums advanced by it in connection with such construction "shall be deemed a charge on the money held under this Agreement . . . or under any building loan agreement relating to said building or premises" deals with a particular situation and does not make the mortgage debt on one mortgage a general charge on money so held under the loan agreement connected with the other mortgage. And the provision that money held by the trustee under the first loan agreement is to be applied in the same manner as the proceeds of a sale of the mortgaged property was, like other provisions of the first mortgage and the first loan agreement, merely for the benefit of the parties to the first mortgage and did not subject such money to the lien of a junior mortgage of the mortgaged property.

Nothing in the supplemental indenture to the first mortgage changes the result here reached.

Since there was no agreement express or implied between the trustee under the first mortgage and the mortgagor that the trustee under the second mortgage or the holders of second mortgage bonds should be entitled to the benefits of the first mortgage, it is unnecessary to consider the effect of such an agreement to which the trustee under the

second mortgage was not a party. See *Central Supply Co.* v. *United States Fidelity & Guaranty Co.* 273 Mass. 139, 143–144. It follows that the trustee under the second mortgage has no greater rights in the money in the possession of the trustee under the first loan agreement than as a second mortgagee it would have ordinarily under a mortgage not covering this money. Apart from such rights, hereinafter considered, the proceeds of the first mortgage loan in the possession of the trustee under the first loan agreement are not held upon trust or subject to any lien for the benefit of the trustee under the second mortgage or any other person claiming thereunder or under the second loan agreement.

4. The trustee under the second mortgage, however, is lawfully entitled to the money in the possession of the trustee under the first loan agreement, which was held by it for distribution under the terms of the first mortgage, on principles of marshalling and subrogation, in priority to the mortgagor, persons having junior encumbrances on the mortgaged real estate and general creditors of the mortgagor.

The money in the possession of the trustee under the first loan agreement, by the terms of the first mortgage, upon a sale of the mortgaged property was security for the first mortgage bonds but, as already stated, was not security for the second mortgage bonds. The mortgaged real estate was security for both the first and the second mortgage bonds, the first mortgage bonds having priority.

The case falls within the established doctrine of two funds — "that a creditor having two funds to satisfy his debt, may not by his application of them to his demand, defeat another creditor, who may resort to only one of" them. *Sowell* v. *Federal Reserve Bank of Dallas*, 268 U. S. 449, 456–457. *Broadway National Bank of Chelsea* v. *Hayward*, 285 Mass. 459, 462. This doctrine is applicable as between a senior and a junior mortgage where the senior mortgage covers property not covered by the junior mortgage. See Sheldon, Subrogation (2d ed.) § 61, and cases cited. And none of the limitation upon this doctrine renders

it inapplicable to this case. It cannot be said that the funds or securities "are not derived from a common source, or are not in the hands of a common debtor," for both the money and the mortgaged real estate, subject to encumbrances, belong to the mortgagor, the Washington Central Trust, the common debtor of the trustee under the first mortgage and the trustee under the second mortgage. And the money in the possession of the trustee under the first loan agreement was readily available to such trustee as trustee under the first mortgage. *Carter* v. *Tanners Leather Co.* 196 Mass. 163, 166, 168. Moreover, the trustee under the first mortgage has already been paid in full out of the proceeds of the foreclosure sale so that the application of the money in the possession of the trustee under the first loan agreement to the payment of the second mortgage bonds will not be injurious to the trustee under the first mortgage or to the holders of first mortgage bonds. And such application of the money will not be injurious to any third party entitled to object thereto. See Sheldon, Subrogation (2d ed.) § 65. No third party except the plaintiff and the defendant architects claims any beneficial interest therein and, as already shown, they have no such interest. Marshalling or subrogation as between successive lien holders will not be refused because of injury to general creditors of the common debtor. And the trustee under the second mortgage can resort to the money in the possession of the trustee under the first loan agreement, though the first mortgage bonds have already been paid in full from the proceeds of the foreclosure sale on the "familiar principle of marshalling assets by means of subrogation" that "when a party, having a right to resort to two funds, to the detriment of another, entitled to be paid out of but one, has been satisfied out of the latter, the fund thus exonerated will in equity be subjected to the payment of the postponed claim." *Hawkins* v. *Blake*, 108 U. S. 422, 435. Sheldon, Subrogation (2d ed.) §§ 61, 62, 63. See also *Broadway National Bank of Chelsea* v. *Hayward*, 285 Mass. 459, 465.

5. Since the trustee under the second mortgage is en-

titled to the money in possession of the trustee under the first loan agreement in priority to the mortgagor, the Washington Central Trust, such money is not property of the mortgagor which the plaintiff and the defendant architects are entitled to reach and apply to the payment of the debts to them of such mortgagor.

B.   The contentions with respect to the amount for which the trustee under the first loan agreement is required to account are these:

The trustee under the second mortgage contends that the money in the possession of the trustee under the first loan agreement should not be reduced after the foreclosure sale, or at least after the application of the proceeds thereof, by any amounts retained or paid as compensation or expenses of such trustee, on the ground that the compensation and expenses of such trustee were fully paid out of the proceeds of the foreclosure sale in accordance with the decree in the foreclosure suit.   This contention cannot be sustained.   The payments authorized by that decree were payments for compensation and expenses of the trustee as trustee under the first mortgage, which were a charge on the mortgaged real estate.   That decree did not purport to deal with rights in the money in the possession of the trustee under the first loan agreement or the compensation and expenses chargeable thereto.

The trustee under the first loan agreement contends that the amount for which it is accountable should not include — as was provided in the decree in this suit — interest at six per cent on the money in the possession of the trustee when the plaintiff's bill was filed.   This contention is sound.   The first loan agreement provides in terms for the addition to amounts deposited with the trustee thereunder of interest "at current banking rates on similar deposits, but not less than at the rate of three per cent. (3%) per annum."   The rights of the trustee under the second mortgage are by way of subrogation to the rights of the trustee under the first mortgage.   Those rights with respect to interest are fixed by the terms of the first loan agreement.   And prior to the entry of a final decree in this suit such trustee is entitled only to

interest in accordance with the terms of the first loan agreement. *Schmidt* v. *People's National Bank*, 153 Mass. 550, 552. See *Chapple* v. *Merchants National Bank*, 284 Mass. 122, 150.

The trustee under the second mortgage, therefore, is entitled to $90,098.92 and interest from January 26, 1931, to the date of the final decree at the rate fixed by the first loan agreement, less reasonable and proper charges incurred after January 26, 1931.

SECOND. As to the suit brought by the Liberty Trust Company, the trustee under the second mortgage, against The National Shawmut Bank of Boston, the trustee under the first mortgage.

The plaintiff in this suit contends that it has a beneficial interest in the surety bond given to the defendant in accordance with the provisions of the first mortgage which entitles the plaintiff to require the defendant to account therefor. The plaintiff contends also that it has a beneficial interest in the money in the possession of this defendant as trustee under the first loan agreement. The contention in regard to this money is considered in the other suit. The contention of the plaintiff in regard to the surety bond cannot be sustained.

The surety bond was given by the Washington Central Trust as principal with corporate sureties to the defendant as trustee under the first mortgage in accordance with the requirements of that mortgage and the first loan agreement. These instruments and the supplemental indenture to the first mortgage were incorporated by reference in the surety bond. The condition of the bond was the completion of the office building and the performance of the obligations of the principal under those instruments until the completion of the building and payment therefor free from liens. And the bond contained an agreement to pay money to the obligee for the completion of the building if the work was taken over by the obligee or the lender. The plaintiff was not an obligee of the surety bond, but it contends that by reason of the specific provisions of the first mortgage and the first loan agreement construed in the light of the circumstances

known to the parties, it has a beneficial interest in such surety bond, as trustee for the holders of the second mortgage bonds.

We think that the plaintiff is not precluded from making this contention by the decree in the foreclosure suit. Since by that decree, in a suit to which both the plaintiff and the defendant in this suit were parties, it was determined that the latter was entitled after the payment of certain taxes and expenses to be paid out of the proceeds of the foreclosure sale of the mortgaged real estate the full amount due on the first mortgage bonds in priority to payments to the trustee under the second mortgage or to any other lien holder, very likely the plaintiff would be precluded by the decree from contending that the transaction with respect to the surety bond amounted to payment in part of the first mortgage bonds or reduced the amount of the lien of the first mortgage. But the plaintiff makes no such contention. And its contention that the surety bond was held by the defendant as security for the second mortgage bonds, in addition to the security of the real estate, was not necessarily involved in the foreclosure suit. That suit, which involved the relative rights of lien holders in the real estate, was not for the same cause of action as the present suit. Nor does it appear that the issue of the right of the plaintiff, representing the holders of second mortgage bonds, to the security of the surety bond was tried and determined in the foreclosure suit as between the plaintiff and the defendant in this suit. Consequently, the decree was not a determination of this issue binding upon them.

The terms of the first mortgage and of the first loan agreement construed in the light of the circumstances known to the parties when these instruments were executed do not support the conclusion that the surety bond was intended to be given and taken for the benefit of the second mortgage bondholders.

The plaintiff relies on the argument that the various instruments executed in connection with financing the construction of the office building were "planned, prepared and executed pursuant to and as material parts of a single

unified plan . . . and with the intention and for the pur-
pose of financing said plan as a whole, and to provide for
the holders of the respective first and second mortgage
bonds to be issued under and pursuant thereto," and that
it was "upon the understanding that said plan and instru-
ments were so designed and prepared and that the securi-
ties therein provided for were designed and intended to be
for the security and protection of all mortgage bonds,
whether first or second," that the various bonds were
issued and negotiated and advances in connection there-
with were made.

It is clear that there was a general plan of financing the
construction of the office building, the terms of which were
known to the participants in the plan and to the sureties.
The parts of the plan were important if not essential to the
plan as a whole and in some instances performance by one
financing group was made conditional on performance by
another group, and in other respects the agreements of
the different financing groups were interrelated. But, for
reasons already stated in the other suit in connection with
the money in the possession of the trustee under the first
loan agreement, no intention can be implied from the gen-
eral plan of financing that the surety bond given in accord-
ance with the requirements of the first mortgage and the
first loan agreement is held for the benefit of the trustee
under the second mortgage or the holders of the second
mortgage bonds. And no such implication can be drawn
from provisions in the instruments under which junior
securities were issued relating to performance by the Wash-
ington Central Trust of terms and conditions of the instru-
ments under which the senior securities were issued, in
view of the provision in the first mortgage limiting the
benefits thereof — which include the benefits of the surety
bond — to the parties thereto and the holders of the first
mortgage bonds. Moreover, the first mortgage containing
this limiting provision was incorporated in the surety bond
and limited the obligations of the sureties thereon.

The plaintiff, trustee under the second mortgage, was not
a party to the first mortgage unless, in accordance with

its contention, as an assign of the trustees of the Washington Central Trust it was within the meaning of the words "'Mortgagors,' parties of the first part," in the first mortgage, which are defined as including such trustees, their successors in the trust and assigns. But the agreement of the "Mortgagors" to furnish a surety bond was not for the benefit of such trustees and created no right, assignable by them, to enforce such bond against the sureties for default of the "Mortgagors." They were obligors, not obligees, of the surety bond. And the second mortgage does not purport to assign any such right. No such right is any part of the equity of the Washington Central Trust included in the "Mortgaged Property" covered by the second mortgage. Obviously the holders of second mortgage bonds were not parties to the first mortgage.

The plaintiff, however, contends that by the terms of the first mortgage upon a foreclosure sale the money collected or collectible on the surety bond became a part of the "Mortgaged Property" under the first mortgage to be disposed of in the same manner as the proceeds of the foreclosure sale.

The specific provisions of the first mortgage relied on by the plaintiff are these: The "Mortgaged Property" is defined as "the land and premises . . . and all property of any and every kind which is now subject or becomes hereafter subject to this indenture or any supplemental indenture." In "the event that the Trustee shall sell the Mortgaged Property under the provision of Article VII hereof, it shall apply such money" — that is, money received under the so called "Completion Bond" — "as in said Article VII provided for the proceeds of such sale." Art. VII provides that when there is a sale of the mortgaged property "pursuant to judicial proceedings" the proceeds thereof shall be applied to the payment of taxes, assessments and liens prior to the lien of the first mortgage, expenses, and principal and interest of the first mortgage bonds, and that "any surplus remaining shall be paid over to the Mortgagors or to whomsoever shall be lawfully entitled thereto." These provisions of the first mortgage are

applicable to the present case since the sale of the real estate was "pursuant to judicial proceedings." But they do not provide expressly or impliedly that the surety bond or its proceeds shall be held for the benefit of the trustee under the second mortgage or the holders of second mortgage bonds. And these provisions, like other provisions of the first mortgage, are solely for the benefit of the parties thereto and the holders of the first mortgage bonds, though they recognize that after the payment of such bonds any surplus remaining must be paid to "whomsoever shall be lawfully entitled thereto." But they do not purport to determine who is "lawfully entitled" to such surplus or to provide that, after the first mortgage bonds have been paid, the same persons are "lawfully entitled" to money so received as are entitled to the proceeds of a sale of the real estate. They do not give to a junior mortgagee any rights in the surety bond or money received thereunder which it would not ordinarily have under the terms of its mortgage.

Since the first mortgage and the first loan agreement contain no provisions, express or implied, that the surety bond is given for the benefit of the trustee under the second mortgage or of the holders of second mortgage bonds, the incorporation of these instruments by reference in the surety bond does not enlarge the obligation of the surety in this respect. On the contrary, the incorporation of these instruments carries into the surety bond the provision limiting the benefits of the first mortgage to the parties thereto and the holders of first mortgage bonds and, consequently, so limiting the benefits of the surety bond. And as there was no agreement, express or implied, between the trustee under the first mortgage and the mortgagor that the trustee under the second mortgage or the holders of second mortgage bonds should benefit from the surety bond given to the trustee under the first mortgage, it is unnecessary to consider the effect of such an agreement where, as here, the trustee under the second mortgage was not a party to the contract of suretyship. See *Central Supply Co.* v. *United States Fidelity & Guaranty Co.* 273 Mass. 139, 143-144.

There were no representations by the defendant in the circulars introduced in evidence by the plaintiff or offered by it and excluded, or in the copies of records of the department of public utilities containing information, statements and circulars furnished under the so called blue sky law in regard to securities to be issued by the Washington Central Trust, that the surety bond was held for the benefit of the holders of second mortgage bonds sufficient to charge the defendant with a duty to account for such surety bond to the trustee under the second mortgage. Detailed analysis of these circulars and records is not necessary.

The plaintiff, trustee under the second mortgage, since the surety bond was not given expressly or impliedly for its benefit or the benefit of the holders of the second mortgage bonds, had no right to the benefit of the surety bond greater than the ordinary right of a second mortgagee. And ordinarily a second mortgagee would have no right to the benefit of such a surety bond. A bond in ordinary form given to a mortgagee of real estate for the completion of a building on the mortgaged premises is merely a guaranty of the security value of the mortgaged property. *Province Securities Corp.* v. *Maryland Casualty Co.* 269 Mass. 75, 94–95. Though the scope of the surety bond here in question is somewhat broader than that of a bond for the completion of the building, and by reason of such broader scope the measure of damages perhaps might be different, the nature of the bond is essentially the same, a guaranty of the first mortgagee's security under the mortgage which is the primary obligation. Doubtless the trustee under the first mortgage could have resorted to the surety bond upon default under the mortgage and consequent breach of the surety bond rather than foreclose the mortgage, but it was not bound to do so. Compare *Silverstein* v. *Saster*, 285 Mass. 453, 458. Whether, if it had done so, the sureties, in view of the terms of the first mortgage and the first loan agreement, would have been subrogated to any rights of the trustee under the first mortgage in priority to the trustee under the second mortgage when ultimately the first mortgage was fully satisfied (see *Westinghouse Electric*

& *Manuf. Co.* v. *Fidelity & Deposit Co. of Maryland,* 251 Mass. 418, 420) need not be decided. In any event, the trustee under the second mortgage was not entitled to have the trustee under the first mortgage resort, in the first instance, to the surety bond on the doctrine of marshalling of assets. 18 R. C. L. 458. The mortgaged land and the surety bond were not two funds or securities derived from a common source. See *Baker* v. *Davie,* 211 Mass. 429, 441. Moreover, since the mortgaged property was the primary source of payment of the first mortgage bonds, the obligation charged thereon could not be marshalled upon a surety bond guaranteeing the security of the mortgage. For like reasons there can be no subrogation of the trustee under the second mortgage on the surety bond after the first mortgage bonds have been paid out of the proceeds of the foreclosure sale of the mortgaged property.

It follows that the plaintiff has no beneficial interest in the surety bond which entitles it to require the defendant to account therefor.

THIRD. The question remains as to the decrees to be entered in the two suits. Both involve the question of the right of the Liberty Trust Company to the money in the possession of The National Shawmut Bank of Boston. The cases were tried together without objection, so far as appears, and no question was raised at the trial, or before us, with regard to the effect of the pendency of one suit on the prosecution of the other. The suit brought by the Liberty Trust Company, however, was commenced before that company in its answer by way of counterclaim in the other suit asserted its rights to the money. There seems to be no reason why the Liberty Trust Company should not have a decree in ts favor in the suit brought by it so far as this money is concerned, or, if such a decree is entered, why the bill and the cross bill of the defendant architects in the suit brought by James Stewart & Company, Incorporated, should not be dismissed without retaining the counterclaim of the Liberty Trust Company for the purpose of giving it the affirmative relief which it obtains in the independent suit. See *Callahan* v. *Mercantile Trust Co.* 188 Mass. 393,

398; *Shea* v. *Lexington*, 290 Mass. 361, 374. The decree, therefore, in the suit brought by James Stewart & Company, Incorporated, is to be reversed and a decree entered dismissing the bill and the cross bill of the defendant architects. And in the suit brought by the Liberty Trust Company against The National Shawmut Bank of Boston the decree is to be reversed and a decree entered ordering the defendant to pay to the plaintiff the money in its hands as trustee under the first loan · agreement amounting to $90,098.92 and interest from January 26, 1931, to the date of the final decree at the rate fixed by the first loan agreement, after deducting therefrom the reasonable and proper charges of the defendant for its compensation as trustee, the compensation of its counsel and its cash expenditures in connection with the trust — including such compensation and expenditures in connection with this suit — incurred after January 26, 1931, as trustee under the first mortgage or under the first loan agreement, the amounts of such charges to be determined by the Superior Court.

*Ordered accordingly.*